**EXXON SHIPPING COMPANY,**
Appellee,

v.

**EXXON SEAMEN'S UNION, Appellant.**

No. 92–5145.

United States Court of Appeals,
Third Circuit.

Argued Dec. 3, 1992.

Decided May 19, 1993.

Howard A. Goldberger (argued), Schneider, Goldberger, Cohen, Finn, Solomon, Miceli, Leder & Montalbano, Cranford, NJ, for appellant.

Douglas B. Neagli, (argued), Exxon Co., U.S.A., Houston, TX and Richard R. Cerbone, Carlin, Maddock, Fay & Cerbone, Florham Park, NJ, for appellee.

Before: SCIRICA, ALITO and LEWIS, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

The Exxon Seamen's Union appeals seeking enforcement of an arbitration award that ordered Exxon Shipping Company to reinstate a helmsman terminated for a positive drug test taken after his ship ran aground. The district court granted summary judgment to the company, vacating the arbitration award as a violation of public policy. 788 F.Supp. 829 (D.N.J.1992). We will affirm.

### I.

On April 7, 1989, the Exxon Wilmington, a 635-foot oil tanker, ran aground in the Mississippi River in Louisiana. After the accident, under Coast Guard regulations and Exxon's Alcohol and Drug Use Policy, Exxon tested the captain, pilot, and helmsman for drugs and alcohol. Because the Coast Guard and Exxon use different screening levels, two sets of tests were conducted by two different laboratories.

Helmsman Morris Foster tested negative at the Coast Guard screening level but positive for marijuana at Exxon's Drug Policy screening level.[1] A confirmatory test corrob-

---

1. Under the Coast Guard regulations and Exxon's policy, two different types of tests are performed: an immunoassay and a confirmatory test using gas chromatography/mass spectrometry (GCMS) techniques. Under the Coast Guard regulations, if the immunoassay test does not show at least 100 ng/ml of marijuana metabolite, a negative result must be reported. 49 C.F.R. § 40.29(e). On the other hand, if this test shows at least 100 ng/ml, then a confirmatory test using GCMS techniques must be performed. Id. at (f).

If this latter test shows at least 15 ng/ml of marijuana metabolite, a positive result must be reported to the employer's medical review officer. 46 C.F.R. § 16.360; 49 C.F.R. § 40.-29(g)(1). Exxon uses lower cut-offs than the Coast Guard regulations—20 ng/ml on the immunoassay and 10 ng/ml on the GCMS test.

In this case, the immunoassay tests found Foster's sample to contain more than 20 ng/ml but less than 100 ng/ml of marijuana metabolite. Thus, he did not meet the cut-off needed for a

orated the positive result. On the confirmatory test, Foster registered 31 ng/ml under the GCMS method. Exxon's expert testified this test would be comparable to a reading of nearly 100 ng/ml on the EMIT test because the GCMS test registers only 20–30% of the total cannabinoids. Finding Foster's positive test a violation of its Drug Policy, Exxon fired Foster.

Exxon's Drug Policy was contained in its collective bargaining agreement. Management added the policy to the agreement on April 1, 1988 after reaching an impasse in negotiations with the Union. The Union did not file a grievance or an unfair labor practice challenging inclusion of the Drug Policy in the agreement. Exxon notified its employees of the Drug Policy in two letters, dated March 29, 1988 and September 27, 1988. Foster does not dispute he received the letters.

Disputes under the collective bargaining agreement are resolved through a grievance procedure that culminates in arbitration. The Union filed a grievance protesting Foster's discharge. Eventually, the matter was submitted to arbitration. On March 13, 1991, two years after the accident, the arbitration board unanimously found Foster had violated Exxon's Drug Policy. Indeed, the board stated that Foster's use of drugs had been "conclusively establish[ed]," but concluded termination was an excessive penalty. It ordered Exxon to reinstate Foster without back pay and directed the company to subject Foster to random drug tests for one year.

The board's decision turned largely on its construction and application of two paragraphs in Exxon's Drug Policy. Paragraph 1 provides that "use, possession, distribution or sale of illicit or unprescribed drugs on Company business or premises is strictly prohibited and is grounds for termination." Paragraph 4 provides that "[t]he Company also

has a right to require employees to submit to medical evaluation or alcohol and drug testing where cause exists to suspect alcohol or drug misuse. A positive test result or refusal to submit to a drug test is grounds for disciplinary action, including dismissal."

The arbitrators found Foster had not violated Paragraph 1 because there was no evidence he had used or possessed drugs on company business or premises. They noted Foster joined the ship from vacation nine days before the testing and credited testimony by Exxon's expert that an individual might be expected to test positive for marijuana fifteen days after using it. The board found Exxon had not met its burden of proving that Foster used marijuana on the ship. The board found Foster violated Paragraph 4, because the accident combined with Coast Guard regulations requiring post-accident drug testing gave Exxon cause to test Foster, and because his positive test was a violation of that paragraph. In so finding, the board noted the company was free to set testing levels lower than those set by the Coast Guard.

In concluding termination was an excessive penalty, the board stressed the differences between the language of paragraphs 1 and 4. Whereas a violation of paragraph 1 was "grounds for termination," a violator of paragraph 4 was subject to discipline "including dismissal." The board interpreted this language to mandate termination for a paragraph 1 violation but to permit discretion to impose termination or a lesser penalty for a paragraph 4 violation. The board indicated it chose the lower penalty of suspension because there was no evidence Foster was impaired while at work, the Company failed to prove Foster used drugs at work, Foster passed the Coast Guard drug test, the company test, which he failed, had a low, although not unreasonable, screening level,

---

positive result under the Coast Guard regulations (100 ng/ml), but he did meet Exxon's lower cut-off of 20 ng/ml. On the confirmatory gas chromatography/mass spectrometry test, Foster's samples were found to contain at least 31 ng/ml of marijuana metabolite. This finding exceeded both the cut-off set out in the Coast Guard regulations (15 ng/ml) and Exxon's cut-off of 10 ng/ml. Nevertheless, the Coast Guard regulations

required that the result of Foster's test be reported as negative because the cut-off for the immunoassay had not been met. The arbitration panel, however, found that Exxon's lower cut-off on the immunoassay was "not unreasonable" and that the totality of the evidence submitted to the panel "conclusively establishe[d]" Foster's use of marijuana.

and termination would not further the goals of the Drug Policy, which it characterized as prevention and rehabilitation.

Exxon brought suit in the United States District Court for the District of New Jersey to vacate the arbitration award as violating public policy and moved for summary judgment.[2] Granting Exxon's motion, the district court identified a strong public policy against having "drug users operate commercial vessels." 788 F.Supp. at 843. The court derived this policy principally from the Coast Guard drug testing regulations.

The court held the board's reinstatement of Foster violated this public policy. 788 F.Supp. at 843–45. It concluded that reinstatement would undermine "the public policy underlying efforts to keep drug users from operating commercial vessels," would subvert Exxon's Drug Policy, would condone illegal activity, and would insufficiently deter drug use by other employees in safety-sensitive jobs. The court emphasized the board's failure to require rehabilitation for Foster and his failure to request rehabilitation. It also noted the board did not expressly find Foster would no longer use drugs or that such a possibility was remote. The Union appealed.

## II.

### A.

■ We have jurisdiction over the district court's grant of summary judgment under 28 U.S.C. § 1291. We exercise plenary review of the district court's grant of summary judgment and apply the same standard the district court should have applied in reviewing the arbitration award. *Stroehmann Bakeries v. Local 776, Int'l Brotherhood of Teamsters,* 969 F.2d 1436, 1441 (3d Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 660, 121 L.Ed.2d 585 (1992). That standard is narrow, reflecting a preference for arbitration expressed in federal labor laws and a desire to promote the benefits of labor arbitration—

speed, flexibility, informality, and finality. *Penntech Papers, Inc. v. United Paperworkers Int'l Union,* 896 F.2d 51, 53 (3d Cir.1990). As a general rule, we must enforce an arbitration award if it was based on an "arguable" interpretation and/or application of the collective bargaining agreement, and may only vacate it if there is no support in the record for its determination or if it reflects a "manifest disregard of the agreement, totally unsupported by principles of contract construction. . . ." *News America Publications v. Newark Typographical Union, Local 103,* 918 F.2d 21, 24 (3d Cir.1990).

■ Under an exception to this rule, we may vacate an arbitration award if it violates a "well-defined and dominant" public policy, which we must "ascertain[ ] by reference to the laws and legal precedents and not from general considerations of supposed public interests. . . ." *W.R. Grace & Co. v. Local Union 759, Int'l Union of Rubber Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). Once we identify a public policy, we must determine whether the arbitrator's award, as reflected in his interpretation of the agreement, violated that policy. *Id.; United Paperworkers Int'l Union v. Misco,* 484 U.S. 29, 43, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1988). In making that determination, we may not "second-guess[ ] the arbitrator's fact-finding, particularly insofar as the conclusion that the asserted public policy would be violated by the employee's reinstatement depends on drawing factual inferences not made by the arbitrator." *United States Postal Serv. v. Nat'l Ass'n of Letter Carriers,* 839 F.2d 146, 148 (3d Cir.1988).

### B.

■ Exxon's primary contention is that the arbitration award violates public policy.[3] A critical source of public policy here is the Coast Guard regulations under which Foster was tested for drugs. 46 C.F.R. part 16

---

**2.** The district court had jurisdiction under section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185 (1988).

**3.** After the events that led to Foster's discharge, Exxon and the union reached an agreement that discharges based on drug tests would no longer

be subject to the grievance and arbitration procedures of the collective bargaining agreement. Thus, as the union's attorney stated at oral argument, the question presented in this case can longer arise between these parties.

(1991). The parties disagree over the scope of the public policy expressed in the regulations. The Union contends the regulation embodies a policy prohibiting drug use by seamen while on duty, while Exxon argues it reflects a policy prohibiting the employment of seamen who use drugs on- or off-duty.

We believe the parties' dispute misses the mark. The distinction between on- and off-duty use is of limited value here because Foster falls neatly into neither category. He tested positive on-duty for marijuana use that may have occurred off-duty. More importantly, this distinction obscures the goal of the public policy embodied in the regulations—safe operation of vessels. In furtherance of this goal, the regulations require drug testing and authorize the imposition of stiff penalties on employees like Foster who fail drug tests. Through testing and penalties, the regulations seek to deter employees from operating vessels with impaired faculties. Whether an employee uses drugs on- or off-duty is relevant only to the extent it bears on this issue. Where, as here, there are test results, they serve as a more accurate indicator of safe operation than the location of Foster's drug use.

The language of the Coast Guard regulations supports our interpretation. It does not distinguish between on- and off-duty drug use. Instead, it provides that an individual who tests positive for drugs "shall be denied employment as a crewmember or removed from duties which directly affect the safety of the vessel's navigation or operations as soon as practicable and shall be subject to suspension and revocation proceedings against his or her license, certificate of registry, or merchant mariner's document...." 46 C.F.R. § 16.201(c). The individual may not then return to work aboard a vessel unless the medical review officer determines that "the individual is drug-free and the risk of subsequent use of dangerous drugs by that person is sufficiently low to justify his or her return to work." 46 C.F.R. § 16.370(d). These powerful sanctions reveal the agency's awareness that employees operating vessels under the influence of drugs or other intoxicants pose an intolerable safety hazard.

In upholding the Coast Guard regulations against a Fourth Amendment challenge, the District Court for the District of Columbia aptly described their purpose, as follows:

> The Government's interests [in the Coast Guard Regulations] can be summarized in one word: safety. Incorporated into this safety interest are the interests of maintaining a drug-free work-place, deterring employees engaged in safety-sensitive tasks from using controlled substances, and ensuring that employees will be prepared to respond quickly and effectively in an emergency situation aboard a commercial vessel.

*Transportation Institute v. United States Coast Guard,* 727 F.Supp. 648, 654 (D.D.C. 1989).

Evidence of Congress' appreciation of this safety hazard appears in the statute authorizing these regulations, which states that "[i]f it is shown that a holder [of a license, certificate, or merchant mariner's document] *has been a user of* ... a dangerous drug, [the license, certificate, or document] *shall be revoked* unless the holder provides satisfactory proof that the holder is cured" (emphasis added). 46 U.S.C. § 7704(c). *See also* 46 U.S.C. § 7503(b)(2). Strictly speaking, we believe this provision does not apply here because we read it only to mandate license revocation where an individual fails a drug test at the Coast Guard screening level. Accordingly, we attribute the Coast Guard's failure to revoke Foster's license to the fact that he passed the Coast Guard test. Nonetheless, we find this statute highly significant when coupled with the arbitration board's finding that Foster's drug use had been "conclusively established."

The Coast Guard regulations are part of a broader public policy against operation of common carriers under the influence of drugs or alcohol. This policy is evidenced by drug testing regulations similar to the Coast Guard's in other Department of Transportation agencies. *See* 14 C.F.R. part 121, Appendix I (1992) (Federal Aviation Administration drug testing program); 49 C.F.R. part 219 (1991) (Federal Railroad Administration drug testing program); 49 C.F.R. part 391 subpart H (1991) (Federal Highway

Administration drug testing program).[4] As the *Transportation Institute* court noted, the safety interests underlying the Coast Guard regulations "are indistinguishable from those safety interests identified [by the Supreme Court upholding drug testing in] the railroad industry." 727 F.Supp. at 654.

Further evidence of the importance of this public policy appears in the decisions considering arbitration awards on similar facts. *See W.R. Grace*, 461 U.S. at 766, 103 S.Ct. at 2183 (courts must ascertain public policy from "laws and legal precedents"); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n Int'l*, 861 F.2d 665, 673 (11th Cir.1988) ("[i]n addition to state statutes and federal regulations, case law also helps define public policy"), *cert. denied*, 493 U.S. 871, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989). Courts faced with public policy challenges to awards reinstating employees of common carriers like Foster have attached great significance to the public safety implications of such awards. The decision of the Court of Appeals for the Eleventh Circuit in *Delta Air Lines* is illustrative. There, the court affirmed the district court's vacation of an award reinstating a pilot who flew a passenger airplane while intoxicated. In concluding reinstatement "would violate clearly established public policy which condemns the operation of passenger airliners by pilots who are under the influence of alcohol," *id.* at 671, the court emphasized that such conduct "endangered the lives of his passengers and crew," *id.* at 674. *See also Amalgamated Meat Cutters & Butcher Workmen, Local Union 540 v. Great W. Food Co.*, 712 F.2d 122, 125 (5th Cir.1983) (vacating arbitration award reinstating tractor-trailer driver after he overturned compa-ny truck while intoxicated); *Union Pacific R. v. United Transp. Union*, 794 F.Supp. 891, 894 (D.Neb.1992) (vacating arbitration award reinstating railroad brakeman who tested positive for alcohol, cocaine, and marijuana after a switching accident on the ground it would violate public policy "against drug and alcohol use in the railroad industry and, more importantly, against reinstating railroad employees in safety sensitive areas whose abuse of drugs and alcohol has jeopardized the safety of the general public and fellow employees").[5]

The significance of the public policy implicated here is highlighted by Congress' decision to authorize a specific agency, the Coast Guard, to oversee and ensure maritime safety. 46 U.S.C. §§ 2103, 2104 (1988), just as it created the FAA to promote aviation safety at issue in *Delta Air Lines*. *See also Iowa Elec. Light & Power Co. v. Local Union 204 of the Int'l Bhd. of Elec. Workers*, 834 F.2d 1424, 1427 n. 2 (8th Cir.1987) (citing existence of Nuclear Regulatory Commission as evidence of significance of federal nuclear safety policy).

In sum, we believe the Coast Guard regulations express a "well-defined and dominant" public policy against the operation of a vessel under the influence of drugs or alcohol. We turn now to the question whether the arbitrators' decision reinstating Foster violated that policy. *W.R. Grace*, 461 U.S. at 766, 103 S.Ct. at 2183.

### III.

### A.

As a threshold matter, we note courts have disagreed over the proper test for determin-

---

4. Under the authority of the Omnibus Transportation Employee Testing Act of 1991, Pub.L. No. 102–143, 105 Stat. 952 (1992), the Department of Transportation has recently proposed broadening the regulations for the Federal Aviation Administration, the Federal Highway Administration, the Federal Railroad Administration, and the Federal Transit Administration to include testing for alcohol abuse. 57 Fed.Reg. 59382 (December 15, 1992). The Department of Transportation did not include the maritime industry in the proposal in light of the Coast Guard's existing regulations on alcohol abuse. *Id.;* 33 C.F.R. part 95 (1992) (Coast Guard alcohol testing regulations).

5. Not only is this public policy widely accepted, it is also longstanding. In denying enforcement to a National Labor Relations Board order reinstating a bus driver discharged for driving while intoxicated more than fifty years ago in *N.L.R.B. v. Dixie Motor Coach Corp.*, 128 F.2d 201 (5th Cir.1942), the Fifth Circuit reasoned that "the public interest ... requires of any one entrusted with the lives and safety of the travelling public that he conduct himself in a manner in keeping with his responsibilities ... The undisputed facts show that this employee's drinking habits place[d] upon his employer the duty to discharge him." *Id.* at 203.

ing whether an arbitrator's award reinstating a discharged employee violates public policy. At least one Court of Appeals has held such an award only violates public policy where it contravenes a rule of positive law which forbids reinstatement of the employee. *American Postal Workers Union v. United States Postal Serv.*, 789 F.2d 1, 8 (D.C.Cir.1986); *Northwest Airlines, Inc. v. Air Line Pilots Ass'n Intern.*, 808 F.2d 76, 84 (D.C.Cir.1987). Other courts have taken a broader approach, ruling that arbitration awards reinstating employees may be vacated if the awards are "inconsistent with some significant public policy." *E.I. DuPont de Nemours v. Grasselli Emp. Ass'n*, 790 F.2d 611, 616 (7th Cir.) (quoting Robert A. Gorman, *Labor Law— Unionization and Collective Bargaining* at 597 (1976)), *cert. denied*, 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986); *Iowa Elec. Light & Power Co. v. Local Union 204 of the Int'l Bhd. of Elec. Workers*, 834 F.2d at 1427 n. 2 (adopting same test); *see also Bd. of County Comm'rs. v. L. Robert Kimball & Assoc.*, 860 F.2d 683, 686 (6th Cir.1988) (stating test as "whether arbitrator's interpretation of the contract jeopardizes ... public policy"), *cert. denied*, 494 U.S. 1030, 110 S.Ct. 1480, 108 L.Ed.2d 617 (1990); *United States Postal Serv. v. American Postal Workers Union*, 736 F.2d 822, 824 (1st Cir.1984) (rejecting test that arbitrator's award must violate positive law).

In its recent decision in *United Paperworkers Int'l Union v. Misco*, the Supreme Court did not resolve this division, expressly reserving the question whether "a court may refuse to enforce an award only when the award itself violates a statute, regulation, or other manifestation of positive law, or compels conduct by the employer that would violate such a law." 484 U.S. at 45 n. 12, 108 S.Ct. at 374 n. 12. We, too, have previously declined to reach this question. *Nat'l Ass'n of Letter Carriers*, 839 F.2d at 150.

The Seventh Circuit's decision in *Local No. P-1236, Amalgamated Meat Cutters & Butcher Workmen v. Jones Dairy Farm*, 680 F.2d 1142 (7th Cir.1982), illustrates the value of a broader public policy test. There, an employee in a meat processing plant challenged a company rule forbidding the employee from reporting plant problems, including unsanitary conditions, directly to the United States Department of Agriculture. After an arbitrator upheld the rule, the employee brought suit to invalidate the arbitrator's decision as violating public policy. The Court of Appeals overturned the award, reasoning "the public policy of insuring sanitary conditions in meat processing," a policy underlying the federal Meat Inspection Act, "outweigh[ed] ... the Company's right to direct its plant operations as it deems most efficient." 680 F.2d at 1145. Thus, although no rule of law forbade the limitation on employee communications imposed by the company rule, *see DUPONT*, 790 F.2d at 616 (emphasizing this distinction), the company rule hindered accomplishment of the goal of the Meat Inspection Act by forbidding employees from reporting conditions that might violate the Act. The court could not have overturned the award—which clearly undermined the public policy of insuring sanitary food—had it applied the narrower "positive law" standard.

The broader test adopted by the First, Sixth, Seventh, and Eighth Circuits appears to be the sounder approach to the question whether an arbitration award violates public policy. Yet we are not certain the line between these approaches is so sharply drawn. Although *Misco* listed violation of a statute as a discrete example of violating positive law, it also referred to violations of "other manifestations of positive law" without defining those manifestations and without indicating what would constitute a violation of them. Accordingly, the distinction between an award which violates a manifestation of positive law and an award which is "inconsistent with public policy" is often blurred.[6] The

---

6. An example of the blurring of this line appears in our pre-*Misco* decision in *Kane Gas Light & Heating v. Intern. Broth. of Firemen and Oilers, Local 112*, 687 F.2d 673, 682 (3d Cir.1982), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1251, 75 L.Ed.2d 480 (1983). Our more recent, post-*Misco* decisions in *National Association of Letter*

*Carriers*, 839 F.2d at 150, and *Stroehmann Bakeries*, 969 F.2d at 1441–44, treat this question differently. *National Association of Letter Carriers* leaves open the question of the appropriate test, and *Stroehmann Bakeries* does not rely on a violation of positive law.

public policy in *Amalgamated Meat Cutters* was clearly grounded in some manifestation of positive law. It seems reasonable that the contours of positive law are broad enough to include not just specific rules or prohibitions but also the stated purposes behind these rules or prohibitions. Where the "positive law" is a stated purpose behind a statute or regulation, to thwart the purpose is to "violate positive law."

█] In view of this, we hold the award reinstating Foster violates the public policy protecting the public and the environment against operation of vessels by drug users.[7] It would undermine the regulations' stated purpose "to minimize the use of intoxicants by merchant marine personnel and to promote a drug-free and safe work environment," 46 C.F.R. § 16.101(a). Reinstating Foster would thwart achievement of the overriding interest in public safety furthered by the regulations. This interest is clearly expressed in the Summary of the Final Rule issued by the Coast Guard upon promulgation of the regulations, stating "[t]he Coast Guard believes these rules will discourage drug and alcohol use by commercial vessel personnel, reduce the potential for marine casualties related to drug and alcohol use, and enhance the safety of the maritime transportation industry." 53 Fed.Reg. 47,- 064 (November 21, 1988).

The award conflicts with the terms of the Coast Guard regulations in several respects. It is inconsistent with the regulations' requirement that individuals testing positive for drugs "shall be denied employment . . . or removed from duties which directly affect the safety of the vessel's navigation or operations," 46 C.F.R. § 16.201(c), and may not return to work aboard a vessel unless rehabilitation is shown. *Id.* § 16.370(d). Reinstatement would also undercut the deterrence function of the Coast Guard regulations. *See Transportation Institute,* 727 F.Supp. at 654 (identifying deterrence as one of the regulations' purposes). Finally, in requiring only that Foster undergo random drug testing for a year, the award failed to impose the regulations' stringent conditions on rehire, which include the certification of the company's Medical Review Officer that the individual is drug-free and the requirement of up to 60 months of random drug testing upon rehire.

Reinstatement of Foster would also be inconsistent with public policy as expressed in other cases vacating awards reinstating operators of common carriers discharged for drug or alcohol use. *See Delta Air Lines,* 861 F.2d at 674, *Amalgamated Meat Cutters,* 712 F.2d at 124, *Union Pacific,* 794 F.Supp. at 895. As noted above, these cases not only are authorities considering arbitration awards on similar facts, but also constitute sources of the public policy identified here.[8] Therefore we hold the arbitration award reinstating Foster violated public policy.

### B.

In reaching our decision, we reject the Union's contention that the district court im-

---

7. In reaching this conclusion, we take only a small step beyond the narrowest understanding of the applicable test for determining whether an arbitration award violates public policy—i.e., whether the award violates positive law. As noted above, the Coast Guard regulations, 46 C.F.R. part 16, their authorizing statute, 46 U.S.C. § 7704(c), and case law are all sources of positive law bearing on this problem. Where, as here, the arbitration panel found that Foster had used marijuana, but required Exxon to reinstate Foster to his "former position" without also finding that he had been "cured" or rehabilitated, the award requiring Foster's reinstatement is contrary to a "well-defined and dominant" public policy. *W.R. Grace & Co.,* 461 U.S. at 766, 103 S.Ct. at 2183. *See also Misco,* 484 U.S. at 43, 108 S.Ct. at 373.

8. The Union's reliance on *Interstate Brands Corp. v. Chauffeurs, Teamsters, Warehousemen and Helpers Local Union No. 135,* 909 F.2d 885 (6th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1104, 113 L.Ed.2d 214 (1991), and *Northwest Airlines, Inc. v. Air Line Pilots Ass'n Intern.,* 808 F.2d at 76, upholding awards reinstating a truck driver and an airline pilot, respectively, for drug and alcohol use, is misplaced. Without accepting the reasoning of those cases, we note that facts identified as critical by those courts are absent here. Unlike in *Interstate Brands,* a case based entirely on off-duty conduct, 909 F.2d at 893, Foster tested positive for drugs while on-duty, and unlike in *Northwest Airlines,* where the arbitration award reinstating an airline pilot was expressly conditioned on the FAA's reinstatement of the pilot, 808 F.2d at 83, the award here contained no such proviso.

properly focused only on Foster's past conduct—his positive drug test—purportedly in conflict with *Misco*'s requirement that the award, not the employee's conduct, must violate public policy. The Union asks us to uphold the award because the arbitration board did not expressly find that Foster was likely to use drugs in the future. We believe this argument is factually and legally incorrect.

The district court did not focus solely on Foster's past conduct. It found especially disturbing the absence of a finding that Foster would no longer use drugs or that the possibility of future use was remote. The court also expressed concern that the award did not require Foster to enter a rehabilitation program and that Foster did not request rehabilitation. Since the purpose of rehabilitation is to minimize the risk of future drug use, the court's focus on this issue reflects it was not concerned exclusively with Foster's past drug use.

Moreover, we do not read *Misco* to establish a bright-line rule that an arbitration award only violates public policy where the arbitrators have made a finding of likely future conduct. *Misco* contains no language establishing such a rule. Indeed, in upholding the arbitration award there, the Court relied on several facts, including but not limited to the absence of a finding of likely future drug use. In *Misco*, an employee who operated a cutting machine in a paper plant was fired after marijuana was discovered in his car parked in the company lot and after the employee himself was found in the back seat of a co-worker's car while a lit marijuana cigarette burned in the front-seat ashtray. An arbitrator reinstated the employee, and the lower courts vacated the award as violating public policy. The Supreme Court reversed. Assuming there existed a public policy against "the operation of dangerous machinery while under the influence of drugs," the Court concluded "no violation of that policy was clearly shown in this case."

The Court emphasized several facts in support of this conclusion. It noted the absence of direct evidence of the employee's past use of drugs while at work, finding "the assumed

connection between the marijuana gleanings found in [the employee's] car and Cooper's actual use in the workplace ... tenuous at best and ... an insufficient basis for holding that his reinstatement would violate the public policy identified by the Court of Appeals ..." 484 U.S. at 44, 108 S.Ct. at 374. The Court also reasoned "it was inappropriate for the Court of Appeals ... [t]o conclude from the fact that marijuana had been found in Cooper's car to have considered the question that Cooper had ever been or would be under the influence of marijuana while he was on the job and operating dangerous machinery...." *Id.* at 44, 108 S.Ct. at 374. Such an inquiry, reasoned the Court, was "an exercise in factfinding about the employee's use of drugs and amenability to discipline" properly left to the arbitrator. *Id.* at 45, 108 S.Ct. at 374. Finally, noting "the award ordered Cooper to be reinstated in his old job or in an equivalent one for which he was qualified," the Court observed "[i]t is by no means clear from the record that Cooper would pose a serious threat to the asserted public policy in every job for which he was qualified." *Id.*

We believe application of *Misco*'s requirement that the arbitration award violate public policy depends on the particular public policy at stake, not on a general distinction between past and future conduct. Thus, the arbitrators' failure to find specifically that Foster was likely to use drugs in the future must be evaluated in the context of the public policy we have identified and, particularly, the Coast Guard regulations. The regulations do not base the continued employment of an employee who tests positive for drugs on a judicial or arbitral finding regarding the likelihood of his future use. Instead, the regulations require the employee to be denied employment, terminated, or removed from safety-sensitive duties after a single positive drug test, 46 C.F.R. § 16.201(c), and condition reinstatement on the determination of the company's Medical Review Officer "that the individual is drug-free and the risk of subsequent use of dangerous drugs by that person is sufficiently low to justify his or her return to work," combined with up to five years of random testing, *id.* § 16.370(d).[9]

9. That the arbitration award required only a year

of random testing and did not condition Foster's

The regulations' strict approach to termination and reinstatement comports with their prophylactic character and furthers their deterrent effect. Accordingly, we are not persuaded by the Union's argument that we must uphold Foster's reinstatement because the arbitration board failed to make a specific finding he was likely to use drugs in the future.[10]

■] Nor can we accept the Union's contention that we must uphold the award because the Coast Guard took no action against Foster, which the Union attributes to the fact he tested negative at the Coast Guard screening level. Although several courts have noted the action or inaction of the relevant federal agency to the employee's discharge, these cases indicate agency action is only one of several factors to be weighed in determining whether an arbitration award violates public policy. *See Iowa Electric*, 834 F.2d at 1427–29 (relying on public policy requiring "strict adherence to nuclear safety rules" and on cases "vacating arbitrators' awards that direct the reinstatement of employees whose deliberate acts have jeopardized public health or safety" as well as on the fact the NRC "endorsed" employee discharge); *Delta Air Lines*, 861 F.2d at 668 n. 3 (noting without discussion the FAA's suspension of the discharged pilot's license); *Northwest Airlines*, 808 F.2d at 83 (relying on airline's policy "of allowing reformed alcoholics to fly as pilots" and the fact "nothing in the law prohibit[s] such a result" as well the fact the award conditioned reinstatement on FAA's recertification of pilot).

Moreover, we believe termination of Foster comports with the public policy embodied in the agency's regulations, even though Foster tested negative at the Coast Guard screening level. The Coast Guard regulations do not bar companies from imposing lower levels. On the contrary, they expressly "prescribe[s] the minimum standards, procedures, and means to be used to test for the use of dangerous drugs." 46 C.F.R. § 16.-101(b). We find especially significant the arbitration board's statement that:

> Here, the standards utilized [by Exxon] are not unreasonable. While the acceptable nanograms per milliliter in the samples were low, they were still detectable by two independent laboratories. Both laboratories performed the test at the 20 ng/ml level. Nothing in the statements of the two laboratory experts suggest an inability to accurately measure the presence of carboxy THC/ML at the 20 ng/ml. Their testimonies stood up to vigorous scrutiny.

Thus, we are not presented with a case in which the company has established unreasonably low screening levels that would yield a positive test from trace amounts that could not cause impairment of faculties. Nor does this case involve borderline test results. Foster's confirmatory test score of 31 ng/ml was more than three times the 10 ng/ml cutoff level on the Company confirmatory test, and, according to the undisputed testimony of Exxon's expert, this score indicated Foster tested perilously close to positive at the Coast Guard's initial screening level.

Finally, we note that although the regulations require that an individual such as Foster who tests positive for drugs "shall be denied employment or removed from [safety-sensitive] duties," they give the Coast Guard discretion whether to take action against the individual, providing only that such individuals "shall be subject to suspension and revocation proceedings...." 46 C.F.R. § 16.-201(c). These sections contemplate enforcement of the public policy against operation of

---

reinstatement on the approval of Exxon's Medical Review Officer weighs in favor of the conclusion that it violated public policy.

10. The Coast Guard regulations distinguish this case from decisions the Union relics upon which rejected public policy challenges to arbitration awards because the awards contained no finding that the employee would violate public policy in the future. *Misco*, 484 U.S. at 45, 108 S.Ct. at 374; *Interstate Brands*, 909 F.2d at 894; *Stead Motors v. Automotive Machinists Lodge 1173*, 886

F.2d 1200, 1216–17 (9th Cir.1989) (en banc), *cert. denied*, 495 U.S. 946, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990); *BPS Guard Services v. International Union, UPGWA*, 735 F.Supp. 892, 897 (N.D.Ill.1990) (all stressing the absence of a finding of likely future public policy violations). In none of these cases did the public policy at stake base reinstatement of the employee on a finding of the Company Medical Review Officer (as opposed to an arbitrator), as do the Coast Guard regulations.

vessels under the influence of drugs by employers as well as by the Coast Guard, and envision the situation that occurred here, in which an employee is discharged although the agency chooses not to discipline him itself.

In response to questioning at oral argument, the Union argued the award did not require Exxon to return Foster to a safety-sensitive job. This distinction is critical because the Coast Guard regulations provide that one disciplinary option for Exxon is "remov[al] [of Foster] from duties which directly affect the safety of the vessel's navigation." 46 C.F.R. § 16.201(c).

The arbitration award itself forecloses this contention. It directs Exxon to return Foster to his "former position," language which unambiguously requires reinstatement of Foster as an able-bodied seaman. Indeed, the Union so argued in the district court. The district court apparently accepted the Union's interpretation and inferred that Foster would have duties affecting the safety of the vessel. Significantly, in arguing on appeal that the award allowed Exxon either to place Foster in another position or to reinstate him as an able-bodied seaman not allowed to perform safety-sensitive duties, the Union conceded it would grieve such actions.

Reinstatement of Foster as an able-bodied seaman not eligible for safety-sensitive duties such as manning the helm would also create a practical problem for Exxon because the company has indicated Foster is not qualified for another job on the vessel. This fact also distinguishes this case from *Misco*. In up-

holding the arbitrator's award there, the Supreme Court noted "the award ordered [the employee] to be reinstated in his old job or in an equivalent one for which he was qualified." 484 U.S. at 45, 108 S.Ct. at 374. The court found this significant because "[i]t [wa]s by no means clear from the record that Cooper would pose a serious threat to the asserted public policy in every job for which he was qualified." *Id.* Here, by contrast, the award directs Exxon to reinstate Foster to his "former position." Furthermore, when this subject was raised for the first time at oral argument, the Union did not dispute Exxon's contention that Foster is not qualified for any other job. Accordingly, we cannot uphold the arbitration award on the ground that it leaves Exxon flexibility to prevent Foster from performing safety-sensitive duties.[11]

### C.

In concluding the award violated public policy, we emphasize, as did the district court, the potentially disastrous effects of a major oil spill on the environment.[12] We also share the district court's concern about seamen operating vessels under the influence of drugs or alcohol. The magnitude of possible harm to the public distinguishes this case from those cases upholding arbitration awards against public policy challenges. The public safety implications at issue here are significantly graver than those presented in *Misco* by the operation of a paper cutting machine by an employee allegedly under the

---

11. At oral argument, the parties indicated Exxon's collective bargaining agreement now mandates the result we reach here. Following Foster's termination, Exxon and the Union reached an agreement under which the company may unconditionally terminate an employee who tests positive for drugs at the company level, and the employee may not grieve or otherwise obtain arbitration of the discharge. Thus, were an arbitrator to order reinstatement of an employee under this revised agreement, we could vacate that award for disregarding the plain language of the agreement without reaching the public policy exception. *See S.D. Warren Co. v. United Paperworkers' Int'l Union*, 845 F.2d 3, 7–8 (1st Cir.) (assuming award reinstating employee discharged for using drugs did not violate public policy but vacating award as contrary to "plain language" of collective bargaining agreement),

*cert. denied,* 488 U.S. 992, 109 S.Ct. 555, 102 L.Ed.2d 582 (1988).

12. Congress has declared that it is "the policy of the United States that there should be no discharges of oil or hazardous substances" into waters under federal jurisdiction. 33 U.S.C. § 1321(b)(1). Congress has implemented this policy by enacting strong measures imposing liability and penalties on those responsible for such spills. 33 U.S.C. § 1321. Indeed, during the life of the parties' collective bargaining agreement, Congress substantially increased liability and penalties for spills in an effort to induce vessel operators to take greater safety precautions. *See* S.Rep. No. 94, 101st Cong., 2d Sess. 3 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 724. This is what Exxon has attempted to do in this case.

influence of drugs. As the *Iowa Electric* court stated:

> In contrast to the safety rules for the United Paperworkers [implicated in *Misco*]—designed to protect employees inside the paper converting plant—are the safety rules Schott violated at *Iowa Electric*—designed to protect not only employees, but also the general public. The public policy at stake in the two cases is simply not the same, as is evidenced by the fact that there is no federal regulatory agency specifically charged with overseeing the safe production of paper, as the NRC does for nuclear power.

834 F.2d at 1427 n. 2. *See also Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173*, 886 F.2d 1200, 1216 (9th Cir.1989) (en banc) (upholding reinstatement of mechanic discharged for improperly tightening lug bolts on automobiles and distinguishing *Iowa Electric* on the ground that "the nuclear power industry is unique both with respect to the magnitude of the risk that results from negligent or reckless employee conduct and the comprehensiveness of governmental regulation"), *cert. denied* 495 U.S. 946, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990); *Chrysler Motors Corp. v. Int'l Union, Allied Indus. Workers of America, AFL–CIO*, 748 F.Supp. 1352, 1362 (E.D.Wis.1990) (upholding award reinstating employee accused of sexual harassment in part on the ground that the employee's case "is not one of the 'hard cases' [such as *Delta Air Lines* and *Iowa Electric*] in which the Eleventh and Eighth Circuits vacated reinstatement awards because the lives of many people could have been directly placed at risk by the actions of the employees in question"), *aff'd in relevant part*, 959 F.2d 685, 689 n. 3 (7th Cir.1992).

The distinction drawn by these courts applies here as well. The operation of an oil tanker by an employee under the influence of drugs or alcohol can result in far more severe and widespread damage than the workplace negligence of the paper plant employee in *Misco* or of the mechanic in *Stead Motors.*[13]

## IV.

For the foregoing reasons, we will affirm the district court's grant of summary judgment.[14]

---

**13.** We note we are not asked here to reinstate an employee who has been successfully rehabilitated, and has complied with the Coast Guard regulations regarding reinstatement. *See Delta Air Lines*, 861 F.2d at 674 (noting "[t]here is no public policy against rehiring former alcoholics, post-rehabilitation" but distinguishing such a case on the ground that "the arbitrator in this case was not authorized to decide whether, having been rehabilitated, [the pilot] should be rehired").

**14.** Because we believe the arbitrator's award violated public policy, we, like the district court, need not reach Exxon's contention that we can vacate the arbitration award on the independent ground that Exxon's September 27 letter to its employees stating it would enforce its Drug Policy more strictly was part of the collective bargaining agreement and that by not explicitly considering that letter, the arbitration board ignored the plain language of the agreement.