**ANCHOR MOTOR FREIGHT, Plaintiff,**

v.

**GENERAL TEAMSTERS LOCAL
326, Defendant.**

Civ. A. No. 93–111–JJF.

United States District Court,
D. Delaware.

Nov. 2, 1993.

Mark Minuti of Saul Ewing Remick & Saul, Wilmington, Peter N. Kirsanow of Allport Miller & Kirsanow, Cleveland, OH, for plaintiff.

Perry F. Goldlust of Heiman Aber & Goldlust, Wilmington, Hugh J. Beins and Ross P. Andrews of Beins Axelrod Osborne Mooney & Green, Washington, DC, for defendant.

## MEMORANDUM OPINION

FARNAN, District Judge.

Presently before the Court are three Cross–Motions for Summary Judgment. (D.I. 13, 17, 22). The Court has jurisdiction pursuant to section 301 of the Labor Management Relations Act. 29 U.S.C. § 185.

For the reasons discussed below, Defendant's Motion for Summary Judgment on the Complaint will be granted (D.I. 13); Defendant/Counterplaintiff's Motion for Summary Judgment on its Counterclaim will also be granted (D.I. 17); and Plaintiff's Motion for Summary Judgment on its Complaint will be denied (D.I. 22).

## I. FACTUAL BACKGROUND

Plaintiff, Anchor Motor Freight, Inc. ("Anchor") is a wholly-owned subsidiary of Leaseway Transportation Corporation ("Leaseway"). Strategic Transportation, Inc. ("STI") is also a wholly-owned Leaseway subsidiary. Anchor was the sole transporter of automobiles for General Motors Corporation ("GM") out of the Wilmington, Delaware GM assembly plant from the years 1947 through 1989. Beginning on October 23, 1989, however, STI began transporting GM Corsica/Beretta automobiles out of the Wilmington GM plant to a railhead in York,

Pennsylvania. Defendant, General Teamsters Local 326 ("the Union") represents the truck drivers that Anchor employed at the Wilmington GM plant. Anchor and the Union are signatories to a collective bargaining agreement, the National Master Automobile Transporters Agreement ("the Agreement").

## II. PROCEDURAL HISTORY

### A. THE UNION'S GRIEVANCE AND THE ARBITRATION DECISIONS

On November 9, 1989, the Union filed a grievance alleging that "Anchor/Leaseway" had violated Article 33 of the Agreement. (D.I. 1, Ex. B). Specifically, the Union claimed that "Anchor/Leaseway" violated Article 33 by creating STI to divert bargaining unit work away from the collective bargaining agreement. (D.I. 1, Ex. B). Article 33, section 1 of the Agreement provides:

> For the purpose of preserving work and job opportunities for the employees covered by this Agreement, the Employer agrees that no operation, work or services of the kind, nature or type covered by, presently performed or hereafter assigned to, the collective bargaining unit ... by the Employer will be subcontracted, transferred, leased, diverted, assigned or conveyed in full or in part, by the Employer to any other plant, business, person or non-unit employees, or to any other mode of operation, unless specifically provided and permitted in this Agreement.

> In addition, the signatory Employer agrees that it will not, as hereinafter set forth, subcontract or divert the work presently performed by, or hereafter assigned to, its employees to other business entities owned and/or controlled by the signatory Employer, or its parent, subsidiaries or affiliates not signatory to this Agreement.

(D.I. 1, Ex. A, Art. 33, § 1).

On February 4, 1992, after conducting a hearing on the issue of the arbitrability of the Union's grievance, a board of arbitrators issued a preliminary ruling which found the grievance to be arbitrable. (D.I. 1, Ex. D). Subsequently, another board of arbitrators ("the Board") held a hearing on the merits of

the grievance. On December 9, 1992, the Board issued its award on the merits sustaining the Union's grievance and holding that Anchor had violated Article 33. *Anchor Motor Freight Inc./Leaseway Transp. Corp. and Teamsters Local Union No. 326*, FMCS No. 90–21747 (1992). (D.I. 1, Ex. E).

Before reviewing the evidence presented by the parties, the Board stated in its opinion that it was adopting the approach and reasoning set forth in a prior arbitration decision, *Complete Auto Transit, Inc. and General Teamsters Local 528*, FMCS No. 89–06700 (1990). *Anchor*, No. 90–21747 at 21. The Board stated that the *Complete Auto* approach, which it was adopting, involved the "interchangeability of the 'human person agents' of the holding corporation and its subsidiaries." *Id.* (quoting *Complete Auto*, No. 89–06700). The Board recognized that analogies to an alter ego analysis were useful in this case; however, the Board declined to rely on an alter ego analysis. *Id.* The Board reasoned that the approach in *Complete Auto* is "simpler and more directly on point." *Id.* at 17–19.

With the *Complete Auto* approach in mind, the Board reviewed the evidence in the subject case. *Id.* at 21–30. The Board first discussed the testimony of Anchor's only witness, Robert C. Paul of GM. *Id.* at 21–26. Mr. Paul had testified that in 1989, GM entertained bids from Anchor and STI for the transportation of the Corsica/Beretta cars out of the Wilmington GM facility to the York railhead. *Id.* at 23, 25.

The Board found Mr. Paul's testimony to be "suspect and self serving" because Anchor had failed to produce the actual bids. *Id.* at 24. The Union had requested from Anchor copies of all bids in 1988 and 1989 for work at the Wilmington GM plant.[1] *Id.* at 22. The Board stated that Anchor had persistently refused to produce the requested and subsequently subpoenaed bid documents. *Id.* The Board drew an adverse inference from Anchor's failure to produce the bids, posing the question, "[i]f there was competitive bidding between Anchor and [STI] for the Corsica Beretta work, why were no bids submitted [into evidence]?"[2] *Id.* at 23.

The Board also discussed the "misleading and inaccurate" testimony of Leaseway officials. *Id.* at 26–30. The Board stated that Leaseway official Robert Hutchison testified that STI was not involved in the Specialized Transportation Group, of which Anchor was a member. *Id.* at 26. However, the Board pointed to Union Exhibits 33 and 34 that expressly identify STI as a member of the Specialized Transportation Group. *Id.* at 27.

In addition, the Board referred to Leaseway official Anthony R. Michel's affidavit and Mr. Hutchison's statement that Anchor and STI did not have common personnel. *Id.* at 28. In contradiction to these statements, the Board pointed to Union Exhibits 13, 33 and 34, which identify Anthony Kosak as the President, Chief Operating Officer ("COO") and a Director of STI and the President and COO of the Specialized Transportation Group, of which both Anchor and STI are a part. *Id.* at 26–27, 29.

The Board found that the misleading and inaccurate testimony of Leaseway officials buttressed the conclusion that "Anchor/Leaseway" diverted work to STI to obtain the business of transporting GM cars under more favorable labor cost considerations. *Id.* at 25, 31–32.

The Board next considered Anchor's legal argument that Anchor did not violate Article 33 because the Union had never performed the particular work at issue. *Id.* at 30–31. In rejecting this argument, the Board stated

---

1. Mr. Paul testified that he believed that the bidding for transporting the Corsica/Berettas occurred in late 1989. *Anchor*, No. 90–21747 at 23. Mr. Paul did identify a letter dated January 20, 1990 sent from GM Managers to the President of Anchor, as "the type of document normally sent out of General Motors regarding the bids." *Id.* The Board, however, discounted this letter as relevant evidence because bidding letters are usually sent out *prior* to the start of a project. *Id.* The bidding letters which Anchor submitted, however, were dated *after* the work in question began. *Id.*

2. The Board found that "Mr. Paul's testimony as a whole tends to support the Union argument that GM was dealing with Leaseway [the holding corporation], and that for the shipper [GM], the distinction between subsidiaries is irrelevant." *Anchor*, No. 90–21747 at 22.

that under Article 33, the Employer agrees not to divert "work or services of the kind, nature or type covered by the Agreement." *Id.* at 30 (quoting the Agreement, Article 33, § 1). The Board stated that transporting Corsica/Berettas from the Wilmington GM plant to the York railhead is work "of the kind, nature and type" that Anchor's Teamster drivers have exclusively performed for GM for many years under the Agreement.[3] *Id.* at 30. The Board held that Anchor's actions were in violation of the Agreement. *Id.* at 32.

After ruling that Anchor violated the Agreement, the Board discussed the proper remedy to which the Union is entitled. *Id.* at 32–33. The Board stated that the appropriate remedy is compensation for the bargaining unit members who would have had the work but for the breach. *Id.* at 32. The Board then discussed the testimony presented regarding the remedy:

> The testimony about the impact on the bargaining unit of the STI work is not definitive....
>
> ....
>
> Where the Union can show a driver was on layoff from Anchor and where STI hauled cars from Wilmington to railheads or dealers in areas routinely served in the past ten years by Anchor drivers, that Anchor driver is entitled to pay and benefits as though he had done the STI work. Any dispute over the remedy may be referred to a mutually agreeable arbitrator.

*Id.* at 32–33 (citations omitted).

The Board concluded its opinion by sustaining the Union's grievance and by direct-

ing Anchor to pay the Union drivers in accordance with the above paragraph. *Id.* at 34.

## B. THE PRESENT ACTION

On March 2, 1993, Anchor filed a Complaint seeking to vacate the two arbitration awards issued in favor of the Union. (D.I. 1). Further, Anchor requested costs and attorneys' fees incurred in the action. (D.I. 1).

In Count I of the Complaint, Anchor asserts that because Robert C. Paul testified that GM "assigned the work" to STI pursuant to a bid procedure, Anchor did not "subcontract or divert" the work in violation of Article 33.[4] (D.I. 1).

In Count II of the Complaint, Anchor claims that the evidence adduced at the arbitration hearings demonstrates that the work in question was not "presently performed" by Anchor drivers.[5] (D.I. 1).

In Count III of the Complaint, Anchor contends that the remedy awarded to the Union violates the Agreement by requiring Anchor to pay damages where Anchor violated no provision of the Agreement. (D.I. 1). Moreover, Anchor claims that the award does not draw its essence from the terms of the Agreement. (D.I. 1).

The Union filed an Answer to Anchor's Complaint in which it raised several affirmative defenses. (D.I. 4). The Union also brought a Counterclaim for enforcement of the arbitration awards. (D.I. 4). In its Counterclaim, the Union requested costs and attorneys' fees incurred in connection with the action. (D.I. 4).

---

**3.** The Board further stated that Article 33, section 1 is "not limited only to work presently performed nor does it specify car models or destinations." *Anchor*, No. 90–21747 at 30.

**4.** Anchor asserts that the Board's decision was a violation of Article 7, section 9(b) of the Agreement, which states that the Board "shall not have the authority to amend or modify this Agreement...." In support of this assertion, Anchor claims that the Board's decision amends or modifies Article 33 and establishes new terms and conditions under the Agreement by making it a violation for an independent third party (GM), as opposed to Anchor, to "subcontract or divert" work. In addition, Anchor asserts that

the Board exceeded its authority and was without jurisdiction regarding the actions of an entity not a party to the Agreement.

**5.** Anchor contends that the Board violated Article 7, section 9(b) of the Agreement by amending and modifying Article 33 and by establishing new terms and conditions under the Agreement by making it is a violation of Article 33 for a third party to assign to another company work that is not presently performed by Anchor drivers. In addition, Anchor claims that the Board exceeded its authority and was without jurisdiction to entertain a grievance regarding work which is not "presently performed" by Anchor drivers.

The Union filed a Motion for Summary Judgment on the Complaint, and subsequently filed a Motion for Summary Judgment on its Counterclaim. (D.I. 13, 17). Anchor then filed a Motion for Summary Judgment on its Complaint. (D.I. 22).

The Union advances four arguments in support of its Motions for Summary Judgment. (D.I. 10). The Union argues that (1) Anchor's allegation that GM "assigned the work" does not alter the conclusion that the work was diverted from the Anchor bargaining unit; (2) the allegation that the work in question was not "presently performed" by the bargaining unit merely constitutes a disagreement with the Board's interpretation of the contract; (3) prejudgment interest should be granted from the date of the arbitration decision; and (4) attorneys' fees are necessary and appropriate. (D.I. 10).

Anchor advances six arguments in support of its Motion for Summary Judgment and in opposition to the Union's two Motions for Summary Judgment. (D.I. 23). Anchor argues that (1) the Board exceeded its powers by amending Article 33 to make it a violation of the Agreement for an independent third party to assign work; (2) the Board exceeded its authority by amending Article 33 to prohibit the assignment of work not presently performed by the bargaining unit; (3) the Board's award is in violation of public policy; (4) the Board exceeded its authority by holding the matter arbitrable where a non-party to the contract assigned the work; (5) the Board exceeded its powers by issuing an award which was not final and definite; and (6) attorneys' fees and prejudgment interest may not be awarded. (D.I. 23).

## III. DISCUSSION

### A. REVIEW OF THE ARBITRATION AWARD

#### 1. STANDARD OF REVIEW FOR A LABOR ARBITRATION AWARD

■ The scope of judicial review of an arbitration award issued pursuant to a collective bargaining agreement is exceedingly narrow. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36–38, 108 S.Ct. 364, 369–71, 98 L.Ed.2d 286 (1987). A court must enforce an arbitrator's award as long as it "draws its essence from the collective bargaining agreement." *Tanoma Mining Co. v. Local Union No. 1269, United Mine Workers*, 896 F.2d 745, 747 (3d Cir.1990) (citing *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)).

■ The United States Court of Appeals for the Third Circuit recently stated:

[A court] must enforce an arbitration award if it was based on an "arguable" interpretation and/or application of the collective bargaining agreement, and may only vacate it if there is no support in the record for its determination or if it reflects a "manifest disregard of the agreement, totally unsupported by principles of contract construction...."

*Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357, 360 (3d Cir.1993) (quoting *News Am. Publications, Inc. v. Newark Typographical Union, Local 103*, 918 F.2d 21, 24 (3d Cir.1990)). Moreover, because the arbitrator's construction of the collective bargaining agreement is bargained for, a court may not vacate an award merely because it views the merits differently or because it finds that the award was based on an error of law. *United Indus. Workers v. Government of V.I.*, 987 F.2d 162, 170 (3d Cir.1993) (citations omitted).

#### 2. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

In this case, as in most cases involving the review of an arbitration decision, only issues of law were presented, and therefore, disposition by summary judgment is appropriate.

#### 3. APPLICATION OF THE STANDARDS

Based on the scope of review of labor arbitration awards and the standard for sum-

mary judgment, the Court concludes the Union's Motions for Summary Judgment must be granted and Anchor's Motion for Summary Judgment must be denied.

■ After a careful review of the record in this case, the Court concludes that the arbitration awards "draw[ ] [their] essence from the collective bargaining agreement," and that the awards are based on "arguable" interpretations of Article 33, section 1. *See Tanoma Mining,* 896 F.2d at 747; *Exxon Shipping,* 993 F.2d at 360.

■ Further, the Court is persuaded that the Board's conclusions are supported both by the factual record and by legal precedent. *See Exxon Shipping,* 993 F.2d at 360. First, the *Complete Auto* approach adopted by the Board was a justifiable approach to utilize in the case. *See Anchor Motor Freight Inc./Leaseway Transp. Corp. and Teamsters Local Union No. 326,* FMCS No. 90–21747 at 21 (1992). Second, the adverse inference drawn by the Board regarding Anchor's failure to produce the bids documents for the Corsica/Beretta project was permissible. *Id.* at 22–24. Third, the record supports the Board's characterization of the testimony of Leaseway officials as "misleading and inaccurate." *Id.* 26–30. Fourth, the record supports the conclusion that the work was diverted to STI so that Leaseway could retain the business of GM by transporting the automobiles under more favorable labor cost conditions. *Id.* at 25, 31–23. Finally, the Board's construction and application of the Agreement was well-reasoned. *Id.* 30–31.

## B. PREJUDGMENT INTEREST AND ATTORNEYS' FEES

In its brief supporting its Motions for Summary Judgment, the Union argues that the Court should award to the Union prejudgment interest, and that an award of attorneys' fees in favor of the Union is necessary and appropriate. (D.I. 10).

■ In light of the circumstances of this case, the Court finds that an award of prejudgment interest is inappropriate because the amount to be recovered by the individual Union members is yet undetermined.

■ The Court, however, finds that an award of attorneys' fees in favor of the Union is proper. In suits to compel one party to abide by an arbitration award, attorneys' fees are generally awarded if the defaulting party acted without justification or did not have a "reasonable chance to prevail." *Chauffeurs, Teamsters and Helpers, Local Union No. 765 v. Stroehmann Bros. Co.,* 625 F.2d 1092, 1094 (3d Cir.1980) (quoting *United Bhd. of Carpenters v. American Superior Midwest, Inc.,* 86 L.R.R.M. 2682, 2685, 1974 WL 1113 (BNA) (W.D.Ark.1974)).

■ In bringing this action to vacate the arbitration awards, the Court believes that Anchor acted without justification and did not have a reasonable chance to prevail. *See id.* As was discussed in Section III.A. above, district courts have an extremely limited scope of review of labor arbitration awards. *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 36–38, 108 S.Ct. 364, 369–71, 98 L.Ed.2d 286 (1987). Anchor had agreed to resolve disputes between itself and the Union through binding arbitration. The decision of the Board in the instant dispute was amply supported by the record and by prior legal decisions. *See Exxon Shipping Co. v. Exxon Seamen's Union,* 993 F.2d 357, 360 (3d Cir.1993). The Board's findings and ultimate construction and application of the Agreement's provisions were clearly within the limits of the Board's authority.

For these reasons, the Court concludes that Anchor did not have "a reasonable chance to prevail," *Chauffeurs,* 625 F.2d at 1094, and therefore, the Union's request for attorneys' fees will be granted.

An Order consistent with this Opinion will be entered.