**CLEVELAND BOARD OF EDUCATION, Appellee,**

v.

**INTERNATIONAL BROTHERHOOD OF FIREMEN
& OILERS LOCAL 701, Appellant.**

[Cite as *Cleveland Bd. of Edn. v. Internatl. Bhd. of Firemen
& Oilers Local 701* (1997), 120 Ohio App.3d 63.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 71344.

Decided June 16, 1997.

*Duvin, Cahn & Hutton, Kenneth B. Stark* and *Bradley A. Sherman;  George S. Crisci,* for appellee.

*Schwarzwald & Rock, Eben O. McNair IV* and *Timothy Gallagher,* for appellant.

---

JAMES M. PORTER, Presiding Judge.

Appellant International Brotherhood of Firemen & Oilers Local 701 ("Union") appeals from the trial court's judgment vacating an arbitrator's award reinstating Union member Timothy Baker, who was discharged for cocaine use by appellee Cleveland Board of Education ("Board"). The Union contends that the trial court erred in concluding that the arbitration award violated public policy and failed to draw its essence from the collective bargaining agreement ("CBA"). The Union contends that the trial court should have confirmed the award. We find no error and affirm the trial court's judgment.

Union member Timothy Baker was employed as a mechanic's helper at the Board's Ridge Road bus depot where he assisted in the repair and maintenance of school buses used to transport children. Baker was a ten-year employee with a good work record showing only one disciplinary episode, a three-day suspension for poor attendance. He had a commercial driver's license which was a condition of his employment.

The Board is subject to the provisions of the Public Employees Collective Bargaining Act, R.C. Chapter 4117. The Union is the exclusive bargaining representative for the unit containing the Board's bus mechanics, including Baker. The collective bargaining agreement ("CBA") between the Board and the Union provided that "[e]mployees covered by this agreement shall be disciplined, demoted, suspended or discharged only for just cause." A four-step grievance procedure was provided, leading to "final and binding arbitration * * *. The arbitrator is prohibited from making any decision or award which is inconsistent with the terms of any agreement between the Board and Union, or contrary to law."

Since at least January 20, 1990, the Board's Transportation Maintenance Work Rules and Employee Handbook contained severe prohibitions against alcohol and drug abuse, stating as follows:

"J.   ALCOHOL AND DRUGS

"No employee required to operate a motor vehicle owned, leased, or in service for the Cleveland City School District, in the ordinary course of employment, shall be under the slightest influence of intoxicants, narcotics, alcohol, amphetamines, or any derivative thereof, or have such items in his/her possession, have

traces of such items in his/her body, or have the odor of intoxicants on his/her breath. Any employee demonstrating behavior which is suspect of being in violation of the above, shall be required to submit to a medical test at a licensed medical facility without charge to the employee. Any employee refusing to submit to such a medical test shall be subject to immediate discharge. Any employee evidenced by medical tests to be in violation of the above, shall be subject to immediate discharge."

The Union apparently acquiesced in these work rules and, as far as the record discloses, did not challenge them or make them the subject of collective bargaining.

The Federal Omnibus Transportation Employee Testing Act of 1991 ("OTETA") (P.L. 102–143; 105 Stat. 952, codified at Section 31306, Title 49, U.S. Code) mandates random drug testing on an annual basis for a certain percentage of an employer's employees holding a commercial driver's license, which included Baker. The preamble to the Act noted Congress's recognition of the significant dangers to the nation from alcohol abuse and illegal drug use in the transportation industry and found at Section 2(3) that "the greatest efforts must be expended to eliminate the abuse of alcohol and use of illegal drugs, whether on duty or off duty, by those individuals who are involved in the operation of aircraft, trains, trucks, and buses."

Subsequent to OTETA and the adoption of federal regulations implementing it, which became effective January 1, 1995, the Board supplemented its Drug and Alcohol Policy to introduce random testing and advised its employees as follows:

"The District's Drug and Alcohol Policies, Regulations and Work rules have not changed and remain in effect. Individuals testing positive for drugs or alcohol are subject to disciplinary action including termination.

"Help is available. If you have a problem or know of someone with a problem you should contact the Helpline at 241–2282. This is a confidential counseling/referral service for the employees of the Board of Education and their families. Additional information is posted on depot bulletin boards or you can check with your supervisor.

"Additionally, any employees having problems with drugs or alcohol are permitted to take a leave of absence for the purpose of undergoing treatment pursuant to an approved program of treatment for alcoholism and or drug use. The leave of absence must be requested prior to the commission of any act subject to disciplinary action."

The Union did not contest these provisions or request that they be subject to the collective bargaining process.

These notices were posted and disseminated to employees describing the requirements of OTETA and the modification to the Board's existing policy. The Transportation Department conducted meetings with its employees, during which materials were distributed explaining the new policy. Baker acknowledged attendance at these meetings, receipt of the handouts, and familiarity with the policy. Baker never availed himself of the offer of assistance extended to those employees who conceded their drug or alcohol problems and came forward for rehabilitation prior to detection.

On February 21, 1995, during random drug testing, it was undisputed that Baker tested positive for cocaine while on duty. He was discharged the next day.

Pursuant to the CBA grievance procedure, Baker sought reversal of his discharge. His grievance was denied at every level of the process. The matter proceeded to an arbitration hearing before a single arbitrator. The Board and Union stipulated the arbitration issues to be: "Whether the Grievant was discharged for just cause? If not, what shall the remedy be."

On November 14, 1995, the arbitrator issued his decision and award. He noted the undisputed background of the case and the respective positions of the Board and Union. He found that Baker had tested positive for cocaine, but stated that "the Employer is found to have lacked the requisite just cause to discharge Timothy Baker [and] he is to be reinstated to employment forthwith." The arbitrator noted that "a positive drug test for cocaine is a serious industrial offense" and suspended Baker for one month (twenty work days without pay), ordering that "all other pay and benefits due him to the date of receipt of this award are to be provided to him."

In the discussion portion of the award, the arbitrator identified the rationale of his decision as follows:

(1) The CBA ¶ 16.2 permitted discipline solely for just cause but did not include specific language "permitting the Employer to discharge employees who test positive on a drug test";

(2) The employer had not previously discharged other employees who had tested positive for drug or alcohol substances, thereby giving second chances;

(3) Bd. Ex. 7 did not "mandate discharge" for a positive drug test, since it provided that such employees "are subject to disciplinary action including termination"; the arbitrator found that the "phraseology contemplates discipline other than termination for people who test positive";

(4) The earlier work rules indicating that termination "shall" result from a positive drug test predated the random testing program of OTETA and are "somewhat contradictory";

(5) Bd. Ex. 7 was unilaterally promulgated by the employer and "absent contractual language permitting the Employer to discharge for a positive drug test result, the requisite 'just cause' standard for discharge is not met in this situation";

(6) There is no suggestion that "[Baker] consumed drugs while on the job." In order for off-duty conduct to form a nexus with job performance the employer's reputation must be damaged, co-workers must be reluctant to work with the employee and/or the employee must be unable to function on the job; and none of these applied.

As noted, the arbitrator overturned Baker's discharge and ordered him reinstated to his previous position with all benefits, subject to a one-month suspension without pay and a drug-free probation period of two years. The Board filed a timely complaint and motion to vacate the award in the common pleas court pursuant to R.C. 2711.13. The Union counterclaimed to confirm the award.

On September 17, 1996, the common pleas court vacated the award on two separate grounds: (1) the arbitrator exceeded his authority by failing to draw the essence of his award from the collective bargaining agreement; and (2) the award violated the clear mandates of Ohio and federal public policy.

A timely appeal ensued. The Union's assignments of error are as follows:

"I. The common pleas court erred in concluding that the arbitrator's award failed to draw its essence from the collective bargaining agreement between the International Brotherhood of Firemen & Oilers, Local 701 and the Board of Education of the Cleveland City School District.

"II. The common pleas court erred in concluding that the arbitrator's award violated public policy.

"III. The common pleas court erred by denying IBF&O Local 701's application to confirm the arbitration award."

· We will first address Assignment of Error II because we find it is dispositive of the appeal. Since we are reviewing the same issues and record that were before the trial court on questions of law, our scope of review is plenary as it would be on summary judgment. The parties also agreed at oral argument that *de novo* review is proper on this appeal.

The general standards applicable before a court may intrude on an arbitrator's award were well stated by this court in *Police Patrolmen's Assn. v. Cleveland* (1995), 107 Ohio App.3d 248, 255–256, 668 N.E.2d 548, 552–554:

"The union appealed the arbitrator's award in this case pursuant to R.C. 2711.10(D). R.C. 2711.10 states:

" 'In any of the following cases, the court of common pleas shall make an order vacating the award upon the application of any party to the arbitration if:

" '* * *

" '(D) The arbitrators *exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.'* (Emphasis added.)

"With regard to the basis that R.C. 2711.10 provides for vacating an arbitrator's award, this court has cautioned that judicial review of the matter must be 'very narrow.' *Cuyahoga Community College v. Dist. 925, Serv. Emp. Internatl. Union AFL–CIO* (1988), 42 Ohio App.3d 166, 170, 537 N.E.2d 717, 720–721.

"Furthermore, the Ohio Supreme Court has declared:

" 'The whole purpose of arbitration would be undermined if courts had broad authority to vacate an arbitrator's award. Thus, this court has stated, "[i]t is the policy of the law to favor and encourage arbitration and *every reasonable intendment will be indulged to give effect to such proceedings and to favor the regularity and integrity of the arbitrator's acts.*" *Campbell v. Automatic Die & Products Co.* (1954), 162 Ohio St. 321, 329 [55 O.O. 195, 198, 123 N.E.2d 401, 405]. Indeed, this court has held that "[a] mere ambiguity in the opinion accompanying an arbitration award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for vacating the award when such award draws its essence from a collective bargaining agreement." *Goodyear v. Local Union No. 200* (1975), 42 Ohio St.2d 516 [71 O.O.2d 509, 330 N.E.2d 703], paragraph one of the syllabus. An arbitrator's award draws its essence from a collective bargaining agreement *when there is a rational nexus between the agreement and the award, and where the award is not arbitrary, capricious or unlawful.'* (Emphasis added.) *Mahoning Cty. Bd. of Mental Retardation v. Mahoning Cty. TMR Edn. Assn.* (1986), 22 Ohio St.3d 80, 83–84, 22 OBR 95, 97–99, 488 N.E.2d 872, 875–876." (Emphasis *sic*.)

Ohio courts have consistently followed this reasoning. See *Findlay City School Dist. v. Findlay Edn. Assn.* (1990), 49 Ohio St.3d 129, 132, 551 N.E.2d 186, 189–190; *Lake Cty. Bd. of Mental Retardation & Dev. Disabilities v. Professional Assn. for Teaching of Mentally Retarded* (1994), 71 Ohio St.3d 15, 19, 641 N.E.2d 180, 182 ("The premise of *Findlay* is that an arbitrator's award which draws its essence from the collective bargaining agreement and which is not unlawful, arbitrary or capricious will be upheld"). In *Local 7–629 v. RMI Co.* (1987), 41 Ohio App.3d 16, 534 N.E.2d 110, the court overturned an arbitrator's award which upheld an employee's discharge where the employer allegedly violated the Workers' Compensation Act in connection with the discharge. The employee was discharged for failure to report to work. The employee, however,

did not report to work because he was on a leave of absence pursuant to the Workers' Compensation Act. The award was vacated because it was "contrary to the public policy and purpose of that law." *Id.* at 20, 534 N.E.2d at 114.

The Board argues that the arbitrator exceeded his powers by overruling the Board's documented policy of "zero tolerance" for drug abuse among its safety-related employees, that the reinstatement award is contrary to the public policy of state and federal law and therefore unlawful, and that the award, in effect, fails to draw its essence from the collective bargaining agreement because the termination was for "just cause." The Union defends the award on the grounds that the Board has not uniformly disciplined its drug abusing employees by discharging them, that the "policy" was not part of the collective bargaining agreement, that public policy was not well defined and dominant mandating the discharge, that we must defer to the broad powers vested in the arbitrator, and that the other grounds which the arbitrator advanced in support of his decision are valid.

■ As stated in the trial court's opinion, an arbitration award is properly vacated when that award is contrary to the well-defined and dominant public policy of Ohio or the United States. The trial court cited *Mahoning Cty. Bd. v. Mahoning Cty. TMR Educ.* (1986), 22 Ohio St.3d 80, 22 OBR 95, 488 N.E.2d 872; *W.R. Grace & Co. v. Local 759* (1983), 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298; *United Paperworkers Internatl. Union v. Misco, Inc.* (1987), 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286. The United States Supreme Court decision in *Misco* explained the reasons for both the public policy doctrine and its limitations, *id.* at 42–43, 108 S.Ct. at 373, 98 L.Ed.2d at 301–302:

"A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy. *W.R. Grace & Co. v. Rubber Workers,* 461 U.S. 757, 766 [103 S.Ct. 2177, 2183–2184, 76 L.Ed.2d 298, 306–307] (1983); *Hurd v. Hodge,* 334 U.S. 24, 34–35 [68 S.Ct. 847, 852–853, 92 L.Ed. 1187, 1194–1195] (1948). That doctrine derives from the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act, and is further justified by the observation that the public's interests in confining the scope of private agreements to which it is not a party will go unrepresented unless the judiciary takes account of those interests when it considers whether to enforce such agreements. *E.g., McMullen v. Hoffman,* 174 U.S. 639, 654–655, 19 S.Ct. 839, 845, 43 L.Ed. 1117, 1123–1124 (1899); *Twin City Pipe Line Co. v. Harding Glass Co.,* 283 U.S. 353, 356–358, 51 S.Ct. 476, 477–478, 75 L.Ed. 1112, 1116–1117, 83 ALR 1168 [1171–1173] (1931). In the common law of contracts,

this doctrine has served as the foundation for occasional exercises of judicial power to abrogate private agreements.

"In *W.R. Grace*, we recognized that 'a court may not enforce a collective-bargaining agreement that is contrary to public policy,' and stated that 'the question of public policy is ultimately one for resolution by the courts.' 461 U.S., at 766 [103 S.Ct. 2177, 2183, 76 L.Ed.2d 298, 307]. We cautioned, however, that a court's refusal to enforce an arbitrator's interpretation of such contracts is limited to situations where the contract as *interpreted* would violate 'some explicit public policy' that is 'well defined and dominant, and is to be ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests." ' " (Emphasis *sic*.) Quoting *Muschany v. United States* (1945), 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744, 756.

These public policy principles were recently analyzed and applied in *Southwest Ohio Regional Transit Auth. v. Amalgamated Transit Union, Local 627* (Sept. 28, 1994), Hamilton App. No. C–930423, unreported, at 5–6, 1994 WL 525543. In *Southwest Ohio*, an arbitrator's decision reinstating a public bus driver's discharge for testing positive for alcohol was vacated by the trial court. That decision was affirmed on appeal because the arbitrator's award was contrary to public policy and did not draw its essence from the collective bargaining agreement.

█ The trial court herein held that the arbitrator's award overturning Baker's termination violated the well-defined public policy of Ohio and the United States prohibiting the use of illegal drugs by transportation employees. The federal law (OTETA) created a nexus between illegal drug use and employees engaged in public transportation. It not only requires the random drug testing of such employees, but prohibits the performance of safety-sensitive functions by employees who test positive for controlled substances. Furthermore, Ohio statutory law prohibits the operation of motor vehicles by those who test positive for illegal drugs. R.C. 4506.15 and 4506.16. It is undisputed that Baker's duties included the maintenance and repair of the Board's buses, for which he was required to have a commercial driver's license.

The United States Department of Transportation, in compliance with OTETA, has issued detailed regulations requiring random drug testing of employees who are required to possess a commercial driver's license. Part 382, Title 49, C.F.R. Those regulations specifically prohibit reporting for duty, remaining on duty or performing a safety-sensitive function if the employee tests positive for controlled substances. Section 382.215, Title 49, C.F.R. Federal regulations also specifically required the Board to establish a policy on the use of controlled substances. Section 382.601, Title 49, C.F.R. Under that policy, the employer must remove from the performance of safety-sensitive functions any employee who tests

positive for drug use. Section 382.601(b)(9). These are the OTETA regulations with which the Board complied when it adopted and disseminated its random drug testing policy, effective January 1, 1995.

The Union argues that because OTETA does not explicitly prohibit reinstatement of an employee who tests positive for drugs, there is no public policy prohibiting the arbitrator's award. Put another way, the argument is that even if the employee's conduct was against public policy, the award reinstating him was not. This raises the issue of whether the reinstatement award has to violate a rule of positive law before it violates public policy. We find it does not.

This issue and the applicable authorities were directly addressed in *Exxon Shipping Co. v. Exxon Seamen's Union* (C.A.3, 1993), 993 F.2d 357, as follows:

"As a threshold matter, we note courts have disagreed over the proper test for determining whether an arbitrator's award reinstating a discharged employee violates public policy. At least one Court of Appeals has held such an award only violates public policy where it contravenes a rule of positive law which forbids reinstatement of the employee. *American Postal Workers Union v. United States Postal Serv.*, 789 F.2d 1, 8 (D.C.Cir.1986); *Northwest Airlines, Inc. v. Air Line Pilots Ass'n Intern.*, 808 F.2d 76, 84 (D.C.Cir.1987). Other courts have taken a broader approach, ruling that arbitration awards reinstating employees may be vacated if the awards are 'inconsistent with some significant public policy.' *E.I. DuPont de Nemours v. Grasselli Emp. Ass'n*, 790 F.2d 611, 616 (7th Cir.) (quoting Robert A. Gorman, Labor Law—Unionization and Collective Bargaining at 597 (1976)), *cert. denied*, 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986); *Iowa Elec. Light & Power Co. v. Local Union 204 of the Int'l Bhd. of Elec. Workers*, 834 F.2d at 1427 n. 2 (adopting same test); *see also Bd. of County Comm'rs. v. L. Robert Kimball & Assoc.*, 860 F.2d 683, 686 (6th Cir.1988) (stating test as 'whether arbitrator's interpretation of the contract jeopardizes * * * public policy'), *cert. denied*, 494 U.S. 1030, 110 S.Ct. 1480, 108 L.Ed.2d 617 (1990); *United States Postal Serv. v. American Postal Workers Union*, 736 F.2d 822, 824 (1st Cir.1984) (rejecting test that arbitrator's award must violate positive law)." *Id.* at 362–363.

After recognizing that *Misco* did not resolve the issue and that there was some blurring of the distinction, the court nevertheless embraced the broader test adopted by the First, Sixth, Seventh and Eighth Circuits and stated:

"It seems reasonable that the contours of positive law are broad enough to include not just specific rules or prohibitions but also the stated purposes behind these rules or prohibitions. Where the 'positive law' is a stated purpose behind a statute or regulation, to thwart the purpose is to 'violate positive law.'

"In view of this, we hold the award reinstating Foster violates the public policy protecting the public and the environment against operation of vessels by drug users. It would undermine the regulations' stated purpose 'to minimize the use of intoxicants by merchant marine personnel and to promote a drug-free and safe work environment,' 46 C.F.R. § 16.101(a). Reinstating Foster would thwart achievement of the overriding interest in public safety furthered by the regulations. This interest is clearly expressed in the Summary of the Final Rule issued by the Coast Guard upon promulgation of the regulations, stating '[t]he Coast Guard believes these rules will discourage drug and alcohol use by commercial vessel personnel, reduce the potential for marine casualties related to drug and alcohol use, and enhance the safety of the maritime transportation industry.' 53 Fed.Reg. 47,064 (November 21, 1988)." 993 F.2d at 364.

This issue was also addressed in *Southwest Ohio Regional Transit Auth. v. Transit Union, Local 627* (Sept. 28, 1994), Hamilton App. No. 930423, unreported, 1994 WL 525543. The court of appeals vacated an arbitrator's award reinstating a bus driver who had been terminated upon testing positive for alcohol. The court of appeals held that the arbitrator's interpretation and reinstatement violated the "long-standing duty imposed upon common carriers of passengers which has remained in effect for many decades. A carrier of passengers is bound to exercise the highest degree of care to ensure the safety of its passengers * * *." *Id.* at 14 (citing *Dietrich v. Community Traction Co.* [1964], 1 Ohio St.2d 38, 30 O.O.2d 22, 203 N.E.2d 344).

In *Southwest Ohio* no public policy was cited that prohibited the reinstatement of a bus driver who drove his bus with alcohol in his system. In vacating the arbitrator's award, the court held that it "join[ed] those courts which have overturned an arbitrator's award of reinstatement on public-policy grounds where the safety of the general public is involved." *Id.* at 16. This is consistent with the spirit of the Ohio Supreme Court's recent pronouncement that an act itself can provide the expression of public policy ("this federal statute [OSHA] constitutes a sufficiently clear expression of public policy to warrant an exception to the doctrine of employment at will, since the federal statute is consistent with Ohio's public policy favoring workplace safety."). *Kulch v. Structural Fibers, Inc.* (1997), 78 Ohio St.3d 134, 152, 677 N.E.2d 308, 322.

We equate the clear public policy that was present in *Southwest Ohio*—namely, a common carrier's duty to use the "highest degree of care to ensure the safety of its passengers" with the parallel duty of the Board to provide safe transportation of school children. Removing drug users from positions repairing school buses is likewise consistent with the Board's duty to use the "highest degree of care to ensure the safety of its passengers." The Union's contention that the employee was not found to be snorting cocaine on the job is immaterial. The whole

purpose of random drug testing is to encourage total abstinence and eliminate the hit-and-miss effect of catching drug abusers in the act. It is equally important that such employees be apprehended and discharged.

The Union attempts to distinguish *Southwest Ohio* because there was no evidence that Baker was under the influence of cocaine while at work, *i.e.*, he was not visibly impaired. However, this argument ignores not only the facts of *Southwest Ohio,* but both Ohio and federal law. In *Southwest Ohio* the driver did not exhibit any signs of being under the influence of alcohol. Rather, the driver was randomly selected for the alcohol test because the previous day he had registered a blood alcohol level four times greater than the permissible limit. When the driver tested at double the permissible limit while driving a bus on the following day, he was terminated. The bus driver, like Baker herein, did not exhibit signs of impairment. Indeed, the arbitrator invalidated the second test because the driver had not "exhibited unusual behavior." *Id.* at 6. The driver, like Baker, was terminated because the test revealed the presence of a prohibited substance at a level greater than the permissible limit. That was sufficient. It was not necessary that the substance be seen to have affected his level of performance.

Moreover, this argument undermines the well-defined public policy that permits random drug testing of safety-sensitive employees in the first place. The random drug testing mandates of OTETA resulted in the discovery of Baker's problem before his drug use caused an accident. As the trial court sensibly held, "the students of the District should not have to wait for a tragedy to befall them before action can be taken to remove drug users from a safety-sensitive position." Under both Ohio and federal law, a positive test for cocaine is cause for the immediate removal of the employee from driving and other safety-sensitive duties. R.C. 4506.16 and Section 382.601(b)(9), Title 49, C.F.R. Neither Ohio nor federal law requires the Board to await the kind of conduct that the random testing was designed to prevent. The Union correctly concedes that "[u]ndoubtedly, Mr. Baker's action in using cocaine was both wrong and illegal * * * ."

Since *W.R. Grace* and *Misco,* a number of federal cases have been decided that illustrate the principles established by the United States Supreme Court. For example, in *Newsday v. Long Island Typographical Union No. 915, C.W.A.* (C.A.2, 1990), 915 F.2d 840, 844, the Second Circuit affirmed the district court's decision vacating an arbitration ward. The arbitrator had reinstated an employee terminated for sexually harassing female coworkers. In affirming the decision, the court held that the arbitrator's decision was in conflict with the well-defined public policy against sexual harassment as articulated by statute, regulations and case law. As the court stated, "the award prevents Newsday from

carrying out its legal duty to eliminate sexual harassment in the work place." *Id.* at 845.

Federal courts have likewise found a pervasive public policy in the area of drug and alcohol use by those individuals who operate in safety-sensitive positions. In *Gulf Coast Ind. Workers Union v. Exxon Co.* (C.A.5, 1993), 991 F.2d 244, 250–254, it was held that the 1988 Federal Drug-free Workplace Act, Section 701 et seq., Title 41, U.S. Code, as well as Texas State Law, corresponding regulations and various judicial rulings, established a well-defined public policy against the use of drugs in the workplace. In *Gulf Coast,* the employee, a process technician responsible for monitoring toxic chemicals, randomly tested positive and was terminated. The arbitrator found that after his termination the employee had undergone rehabilitation and reinstated the employee. The district court vacated the arbitrator's award, and the Fifth Circuit affirmed on the basis that returning the employee to his prior safety-sensitive position would pose a serious threat to the safety of others and demonstrated a "plain violation of 'well defined and dominant' public policy." *Id.* at 255. None of the laws or regulations cited by the court prohibited the reinstatement of an employee who previously used cocaine.

The Union argues that *Gulf Coast* is inapplicable principally because the grievant there violated that company's drug policy twice whereas Baker violated the Board's policy only once in the instant case. On the contrary, the Gulf Coast employee was caught using a prohibited substance only once, after he had voluntarily entered treatment with impunity, just as Baker could have done. Consequently, that result is indistinguishable from the Baker circumstances in that each was caught using cocaine on a single occasion through a randomly administered drug test. A "zero tolerance" program is next to useless if the offending employee gets a slap on the wrist and a second chance, the same as an employee voluntarily seeking rehabilitative treatment.

In a similar case, *Exxon Shipping Co. v. Exxon Seamen's Union, supra,* 993 F.2d 357, it was held that reinstatement of a tanker helmsman who had tested positive for marijuana use violated the established public policy protecting the public and the environment against the operation of vessels by drug users. Specifically, the court found that reinstatement would thwart the achievement of the overriding interests in public safety furthered by Coast Guard regulations. *Id.* at 364. Moreover, the court found that the line of decisions vacating reinstatement awards of transportation employees discharged for drug and alcohol use created a specific well-defined public policy against allowing these individuals to continue in safety-sensitive positions. *Id.* See, also, *Delta Air Lines, Inc. v. Air Line Pilots Assn. Internatl.* (C.A.11, 1988), 861 F.2d 665; *Iowa Elec. Light & Power v. Local Union 204* (C.A.8, 1987), 834 F.2d 1424; *Amalgam-*

*ated Meat Cutters v. Great W. Food Co.* (C.A.5, 1983), 712 F.2d 122, 124. Most significantly, in none of these cases did a statute or regulation prohibit the reinstatement of the employee. Rather, in all of these cases, the courts have found that the public policy prohibiting alcohol or drug abuse would be thwarted if employees were reinstated after being caught.

■ The trial court also relied on R.C. 4506.15(A) and (C), which prohibit an individual from either (1) driving a commercial motor vehicle while having a measurable or detectable amount of a controlled substance in his blood, breath, or urine, or (2) driving a commercial motor vehicle while under the influence of a controlled substance. Thus, Ohio law specifically prohibited Baker's conduct. Notwithstanding the criminal penalties of a first-degree misdemeanor under R.C. 4506.16, it also provides for a removal from service for twenty-four hours and a one-year suspension of the commercial driver's license. R.C. 4506.16 and 4506.99. In short, under Ohio law, simply having a detectable amount of a controlled substance in one's system is a criminal offense punishable by up to six months in jail. The prohibitions of Ohio's criminal statutes can provide a source of clear public policy to guide civil litigation. See *Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 70–71, 652 N.E.2d 653, 657–659. The arbitrator's award is squarely at odds with that public policy of Ohio.

Nor are we persuaded to ignore the strong public policy at stake here because the Board may have previously failed to discharge personnel who have come forward, confessed their habit and entered rehabilitative treatment. These episodes occurred prior to the random testing program mandated by OTETA and introduced on January 1, 1995. Both the OTETA program and the Board's policy encourage safety-related employees to admit their problems and seek rehabilitative services. This Baker did not do. If those who hide their drug problems are to be treated the same as those who confess and seek treatment, the rehabilitative purpose behind the program will be ignored. Under the theory espoused by the arbitrator, an employer will always be estopped to toughen its antidrug program by some misguided theory of disparate treatment. The safety of schoolchildren should not be compromised in such a manner.

It cannot be seriously contended that cocaine use by a school bus mechanic performing a safety-related function is not "just cause" for immediate discharge. An employer does not have to tolerate this condition or give unfaithful employees a second chance. Drugs have become a scourge in the workplace as in society as a whole. A message that a cocaine user can get caught once and escape discharge undermines the public policy behind encouraging voluntary rehabilitative care and minimizes the serious nature of the offense.

Therefore, we find that enforcement of the arbitrator's award is contrary to an explicit, well-defined and dominant public policy of state and federal law to

suppress illegal drug use among transportation employees. The trial court was correct in refusing to enforce it.

Assignment of Error II is overruled.

Given the foregoing disposition, it is unnecessary to address Assignments of Error I and III, which are moot. App.R. 12(A)(1)(c)

*Judgment affirmed.*

NAHRA, J., concurs.

DYKE, J., dissents.

ANN DYKE, Judge, dissenting.

In that the parties' collective bargaining agreement provided for a "final and binding arbitration award," I would reinstate the award of the arbitrator, and would reverse the judgment of the trial court.

It is well settled that the law favors and encourages arbitration. *Findlay City School Dist. Bd. of Edn. v. Findlay Edn. Assn.* (1990), 49 Ohio St.3d 129, 131, 551 N.E.2d 186, 188–189. Every reasonable intendment will be indulged to give effect to such proceedings and to favor the regularity and integrity of the arbitrator's acts. *Id.* The *Findlay* court explained:

"Arbitration provides the parties with an alternate method of dispute resolution. 'It provides the parties with a relatively speedy and inexpensive method of conflict resolution and has the additional advantage of unburdening crowded court dockets.'" *Id.*, quoting *Mahoning Cty. Bd. of Mental Retardation v. Mahoning Cty. TMR Edn. Assn.* (1986), 22 Ohio St.3d 80, 83, 22 OBR 95, 98, 488 N.E.2d 872, 875.

Thus, in order to preserve the integrity and purposes of the arbitration system of dispute resolution, the Supreme Court of Ohio has determined that courts have limited authority to vacate or modify an arbitrator's award pursuant to R.C. 2711.10(D). *Findlay*, 49 Ohio St.3d at 131–132, 551 N.E.2d at 189–190. This court has· likewise cautioned that judicial review pursuant to R.C. 2711.10(D) must be "very narrow." *Cuyahoga Community College v. Dist. 925, Serv. Emp. Internatl. Union AFL–CIO* (1988), 42 Ohio App.3d 166, 170, 537 N.E.2d 717, 720–721.

The arbitrator "is to bring his informed judgment to bear in order to reach a fair solution of a problem." *United Paperworkers Internatl. Union AFL–CIO v. Misco, Inc.* (1987), 484 U.S. 29, 41, 108 S.Ct. 364, 372, 98 L.Ed.2d 286, 301. Arbitrators have considerable leeway to interpret and apply the terms of collective bargaining agreements, and the parties agree in final binding arbitration to

accept the arbitrator's award "regardless of its legal or factual accuracy." *Marra Constrs., Inc. v. Cleveland Metroparks Sys.* (1993), 82 Ohio App.3d 557, 562, 612 N.E.2d 806, 809.

Further, "[a] mere ambiguity in the opinion accompanying an arbitration award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for vacating the award when such award draws its essence from a collective bargaining agreement." *Goodyear Tire & Rubber Co. v. Local Union No. 200, United Rubber, Cork, Linoleum & Plastic Workers of Am.* (1975), 42 Ohio St.2d 516, 71 O.O.2d 509, 330 N.E.2d 703, paragraph one of the syllabus. An arbitrator's award draws its essence from a collective bargaining agreement when there is a rational nexus between the agreement and the award, and where the award is not arbitrary, capricious or unlawful. *Mahoning Cty, supra,* 22 Ohio St.3d 80, 22 OBR 95, 488 N.E.2d 872, paragraph one of the syllabus.

In this case, the parties submitted to "binding arbitration." In their collective bargaining agreement, both parties agreed that if an answer to a grievance was determined to be unsatisfactory, the "Union shall have the right * * * to submit the matter to arbitration." The collective bargaining agreement further provided:

"The Arbitrator shall render a written decision and award resolving the controversy and ordering all appropriate relief. The decision and award of the Arbitrator shall be final and binding upon the Board, the Union, and the employees affected by the decision and award. The Arbitrator is prohibited from making any decision or award which is inconsistent with the terms of any agreement between the Board and Union, or contrary to law."

The arbitrator chosen in this instance determined that Timothy Baker should not be terminated from employment in light of, *inter alia,* language within the collective bargaining agreement that included termination as a disciplinary option but did not mandate termination, and other instances in which the employer disciplined but did not terminate other similarly situated employees. Thus, in my view, the arbitrator's award does draw its essence from the collective bargaining agreement. There is a rational nexus between the agreement and the award, and the award is neither arbitrary, capricious, nor unlawful. Finally, with regard to the public policy considerations underlying the vacation of the arbitration award, I would conclude that it is unclear from this record whether public policy favors termination rather than removal from safety-sensitive positions with closely monitored rehabilitation. I would, therefore, defer to the arbitrator's decision on this point as well.