SOUTHWEST OHIO REGIONAL TRANSIT AUTHORITY, Appellee,

v.

AMALGAMATED TRANSIT UNION, LOCAL 627, Appellant.

[Cite as *Southwest Ohio Regional Transit Auth. v. Amalgamated Transit Union, Local 627* (1998), 131 Ohio App.3d 751.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–970967, C–971118 and C–980044.

Decided Dec. 31, 1998.

752

*Dinsmore & Shohl, L.L.P., Charles M. Roesch* and *Robert J. Reid,* for Southwest Ohio Regional Transit Authority.

*Kircher Robinson & Welch, James B. Robinson; Jubelirer, Pass & Intreiri, P.C.,* and *Joseph J. Pass,* for Amalgamated Transit Union, Local 627.

MARIANNA BROWN BETTMAN, Judge.

This is a trio of appeals that we have *sua sponte* consolidated for decision due to the commonality of the key issues.

## SORTA DRUG AND ALCOHOL PREVENTION PROGRAM

All three appeals involve Southwest Ohio Regional Transit Authority ("SOR-TA") employees who are members of Amalgamated Transit Union Local 627 ("the Union"). All three employees were involved in grievances that were unsuccessfully resolved and that proceeded to binding arbitration under the Collective Bargaining Agreement ("CBA") then in effect between SORTA and the Union.[1] All three cases involve violations of the drug portion of SORTA's Drug and Alcohol Prevention Program ("the policy") promulgated February 1, 1995.

SORTA's first Drug and Alcohol Policy was promulgated in 1988. Because of changes in federal regulations that we shall discuss as pertinent, SORTA significantly changed its policy February 1, 1995, to conform to federal testing guidelines. However, SORTA did not adopt the federal discipline guidelines that allow for progressive discipline for positive test results. Under SORTA's policy, an employee who tests positive on a drug-screen test is fired.

Under the management rights provision and the operation of rules provision of the CBA, SORTA has the right to reserve certain policies to itself to promulgate unilaterally. The Drug and Alcohol Prevention Program is such a policy. The Union challenged the 1988 policy in an arbitration proceeding. Arbitrator Dissen

---

1.  The effective dates of this CBA were January 8, 1994 through January 7, 1997.

found that SORTA had the right to promulgate the 1988 policy unilaterally, but expressed no opinion on the reasonableness of the 1988 policy.[2]

## CASE OF SARAH BAKER

## SORTA'S DRUG POLICY FOR SAFETY-SENSITIVE EMPLOYEES

The Baker case involves marijuana. The test for marijuana metabolites has two parts, which for the sake of simplicity we refer to as the screening test and the confirmatory test. A positive reading on the screening test will trigger the second, more discriminating confirmatory test.[3] For the purposes of this appeal, we will limit our analysis to the confirmatory test, because it is a positive reading on this test that results in termination.

Under the 1988 policy, a positive confirmatory test for marijuana was defined as 50 ng/ml of marijuana metabolites in a urine sample. Any lesser amount was not considered a positive test. However, under pertinent federal regulations, a result of 15 ng/ml of marijuana metabolites or more on a confirmatory test is considered a positive test. Any lesser amount is considered a trace amount, to take into account passive inhalation.

Beginning January 1, 1995, the Department of Transportation ("DOT") mandated random drug testing for all safety-sensitive employees and the reporting of all positive tests. On February 1, 1995, SORTA changed its drug policy to conform to these changes and adopted the federal regulations governing the definition of a positive drug test. Accordingly, the definition of what was considered a positive confirmatory test for marijuana under the SORTA policy was lowered from 50 ng/ml to 15 ng/ml. However, unlike the federal regulations, which have options other than firing for employees who test positive for drugs,[4] the SORTA policy does not. Thus, under the policy, beginning in February 1995, any SORTA employee with a confirmatory test for marijuana metabolites of 15 ng/ml would be fired.

Employees were notified of the change in policy in several ways. The policy was posted and each employee was sent a letter enclosing the new policy. Training was also given on the new policy.

---

**2.** A.A.A. No. 52–30–0142–89.

**3.** This tests only the chemical compound THC. An employee who tests positive on the confirmatory test can also elect to have the urine sample retested. This is known as the "split sample."

**4.** Section 653.35, Title 49, C.F.R.

## ARBITRATION OF SARAH BAKER

Sarah Baker is a bus driver. As such, she is indisputably a safety-sensitive employee under the federal regulations and SORTA's policy.[5] Pursuant to the policy, safety-sensitive employees are subject to random drug tests. These tests are given at times when employees are on duty. Baker was given such a test on January 2, 1996, after she appeared for work. Her initial screening test was positive. She then tested at 37 ng/ml of marijuana metabolites on the confirmatory test, declined the split-sample test, and was discharged. She filed a grievance, which proceeded to arbitration.

At the arbitration, Baker's defense was that although she knew that the consequence of a positive test was termination, she had not smoked marijuana, but was the victim of passive inhalation because she had attended a party in a small, enclosed space where much marijuana was smoked.

The neutral arbitrator found not believable Baker's testimony that her test result of 37 ng/ml came only from passive inhalation. However, he also found that although Baker had adequate notice that a positive test would result in termination, "positive" was not defined in the notice or the policy, nor was Baker informed that the definition of positive on the confirmatory test had been lowered by SORTA from 50 ng/ml to 15 ng/ml. He found this of particular significance, given the fact that Baker's confirmatory test result of 37 ng/ml would not have resulted in any disciplinary action under SORTA's old policy. The arbitrator thus concluded, on due process grounds, that Baker's termination was not for just cause. He ordered Baker reinstated without back pay, under a number of conditions addressing safety issues.

SORTA filed an application to vacate the arbitrator's award in the common pleas court. The Union filed an application to confirm the award. Cross-motions for summary judgment were filed on a stipulated record. The case was assigned to a magistrate, who found in favor of SORTA and vacated the arbitrator's award. The trial court adopted the magistrate's decision over the Union's objection. An appeal by the Union followed under the number C–970967.

## CASE OF STEWART CLEM

### SORTA POLICY ON REFUSAL TO PROVIDE SAMPLE FOR TEST

Under the SORTA policy, an employee who refuses to provide a urine sample during a random drug test is terminated. There are several definitions of

---

**5.** "Safety-sensitive employees" are defined in the policy as "employees who perform job duties related to the safe operation of mass transit service including the operation, dispatch, and control, maintenance and supervision of revenue service vehicles, and any employee who holds a Commercial Driver's License."

"refusal" under the policy. The pertinent definition for this appeal is the failure to provide a sample without a valid medical explanation.

An employee who cannot provide a urine sample has two hours to provide a sample, starting from the time of the initial inability. The employee is given twenty-four ounces of water.[6] If, after that time, an employee still cannot provide a sample, the testing is discontinued, and the employee is referred for a medical evaluation to determine whether there is a legitimate medical reason for the inability. If there is no medical reason, the inability is deemed a refusal, and the consequence is termination.

## ARBITRATION OF STEWART CLEM

Stewart Clem is a mechanic who worked for SORTA for ten years. He, too, was a safety-sensitive employee under federal regulations and the SORTA policy, and as such was subject to random drug testing under the policy. Clem was sent for his test on February 9, 1996.

Clem was unable to provide a urine sample. After two hours had passed, Clem still could not provide a urine sample. He offered to be catheterized, but was told that such a procedure was not an option under the policy.

At the end of the two hours, at the direction of SORTA's medical review officer, Clem was referred to his own doctor to determine whether there was a legitimate medical reason for his failure to produce a urine sample. Clem's physician, Dr. Reuss, indicated that he suspected the reason for Clem's failure to provide a sample was anxiety. This was deemed an inadequate explanation by SORTA, and Clem was fired.

After his termination, Clem submitted additional medical material to SORTA, including a report from a urologist opining that Clem suffered from a "bashful bladder," meaning that Clem was among those persons unable to urinate on demand or in the presence of others. Dr. Reuss provided supplementary material concurring in this opinion. SORTA's medical review officer considered this material, but ultimately did not accept the explanation as a legitimate medical reason for failure to provide a sample.

Clem's termination was ultimately submitted to arbitration. The neutral arbitrator found that SORTA had failed in its obligation under the just cause provision of the CBA to investigate and consider the mitigating circumstances and that the evidence established that Clem was unable, not unwilling, to take the test. Concluding that Clem's discharge was "patently unfair and unreasonable

---

6. On July 19, 1996, the federal regulations were revised to allow an individual forty ounces of water and three hours to provide a urine sample.

under the circumstances," the arbitrator held the discharge not for just cause, and ordered it set aside. SORTA was ordered to reinstate Clem with full seniority and benefits.

SORTA filed an application to vacate the arbitrator's award in the court of common pleas. The Union filed an application to confirm the award. Cross-motions for summary judgment were filed. The trial court granted the Union's motion and confirmed the arbitration award. SORTA then filed an appeal under the number C–971118.

## CASE OF JOSEPH BINDER

### SORTA'S DRUG POLICY ON NON-SAFETY-SENSITIVE EMPLOYEES

Unlike Baker and Clem, Joseph Binder was not a safety-sensitive employee. He was employed as a storekeeper in SORTA's storeroom. Part of Binder's job as a storekeeper was to operate a forklift every day and, on rare occasions, to drive a parts van to various SORTA divisions. Because Binder's job required him to operate SORTA vehicles, he was a covered employee[7] under the policy, which meant that he was subject to a biennial physical examination that included a drug test. This was not a random test; rather it was scheduled on an off-duty date selected by the employee. Even for non-safety-sensitive employees, however, the consequence of a positive drug test result under the SORTA policy is termination. The levels that constitute a positive screening and a positive confirmatory test are the same for safety-sensitive and non-safety-sensitive employees.

Binder tested positive for marijuana on both his screening and confirmatory tests on the day he chose to have his physical examination. As a result, he was terminated, despite his fifteen years of service, all without discipline, and his receipt of safety awards for thirteen consecutive years.

### ARBITRATION OF JOSEPH BINDER

Binder's termination proceeded to arbitration. It was undisputed at the arbitration that Binder tested at 36 ng/ml on his confirmatory test and that this result constituted a positive test under the policy. Binder also admitted he understood the policy and its consequences. The neutral arbitrator found, however, that there was an ambiguity in the policy because of a conflict between the provision in the policy mandating the termination of any employee who tested positive for drugs on his biennial physical, and the provision in the policy

---

7. A covered employee is defined in the policy as any employee who drives or may drive Metro vehicles.

providing for removal from duty and temporary suspension for an employee who failed the biennial physical examination for a "correctable or temporary problem." [8] The arbitrator concluded that it would not be in accordance with the general just cause provision of the CBA to apply one part of the policy (the firing) and to disregard the other (the temporary suspension). He found that Binder's condition was temporary and correctable. Thus, he ordered Binder suspended for thirty days, then reinstated to his position.

SORTA filed an application to vacate the arbitration award in the court of common pleas. The Union filed an application to confirm the arbitration award. The trial court heard the matter on cross-motions for summary judgment and found in favor of SORTA. The Union appealed under the number C–980044.

## APPEAL TO COMMON PLEAS COURT

In all three of these cases, SORTA has sought to overturn an arbitration award in favor of an employee. In appealing to the court of common pleas, SORTA relied in each case on the argument that the arbitration award violated the public policy of Ohio and that the arbitrator exceeded his authority under R.C. 2711.10(D).[9] In the cases of Baker and Binder, the trial court agreed with SORTA and vacated the awards. In the case of Clem, the trial court agreed with the Union and confirmed the arbitration award.

## JUDICIAL REVIEW OF LABOR ARBITRATION AWARDS

Because the grounds to set aside an arbitration award are rare, and court review narrow, it behooves us to review the fundamentals of judicial review that we analyzed extensively in *SORTA v. Amalgamated Transit Union, Local 627* (Sept. 28, 1994), Hamilton App. No. C–930423, unreported, 1994 WL 525543 ("SORTA I").

We quote from that decision:

"Judicial review of labor arbitration awards is unarguably narrow. Neither side in this case disputes this fact. Both the United States Supreme Court and the Ohio Supreme Court have repeatedly emphasized the deference to be given to an arbitrator's findings. See, generally, *United Paperworkers Internatl. v.*

---

**8.** Part I, Section 6.1 of the policy.

**9.** R.C. 2711.10(D) provides:

"In any of the following cases, the court of common pleas shall make an order vacating the award upon the application of any party to the arbitration if:
"* * *

"(D) The arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."

*Misco, Inc.* (1987), 484 U.S. 29, 36–38, 108 S.Ct. 364, 369–371, 98 L.Ed.2d 286 [297–299]; *United Steelworkers of America v. American Mfg. Co.* (1960), 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; *United Steelworkers of America v. Warrior & Gulf Navigation Co.* (1960), 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; *United Steelworkers of America v. Enterprise Wheel & Car Corp.* (1960), 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424.

"The Ohio Supreme Court adopted with approval this limited judicial review in *Goodyear Tire & Rubber Co. v. Local 200* (1975), 42 Ohio St.2d 516 [71 O.O.2d 509], 330 N.E.2d 703. The court expressly followed the holding of *United Steelworkers of America v. Enterprise Wheel & Car Corp., supra,* that 'the refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements.' *Goodyear Tire & Rubber Co.,* 42 Ohio St.2d at 520 [71 O.O.2d at 511], 330 N.E.2d at 707. This 'hands off' approach has been often repeated. See, *e.g., Hillsboro v. Fraternal Order of Police, Ohio Labor Council, Inc.* (1990), 52 Ohio St.3d 174, 556 N.E.2d 1186 (when a provision in a collective-bargaining agreement is subject to more than one reasonable interpretation, arbitrator's interpretation and not that of a reviewing court governs the rights of the parties); *Findlay City School Dist. Bd. of Edn. v. Findlay Edn. Assn.* (1990), 49 Ohio St.3d 129, 551 N.E.2d 186 (once it is determined that the arbitrator's award draws its essence from the collective-bargaining agreement and is not unlawful, arbitrary or capricious, a reviewing court's inquiry for purposes of vacating an arbitrator's award is at an end).

"Nevertheless, the courts have also recognized that, while limited, reviewing courts do have an important role to play in the review of labor arbitration cases, most notably in matters involving public policy.

"In the case of *W.R. Grace & Co. v. Internatl. Union of United Rubber* (1983), 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298, the United States Supreme Court held that a court may not enforce a collective-bargaining agreement that is contrary to public policy. The Court specifically found that the issue of public policy was for the courts to resolve. The Court went on to explain that a court's refusal to enforce an arbitrator's interpretation of a contract provision is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. *W.R. Grace,* 461 U.S. at 766, 103 S.Ct. at 2183 [76 L.Ed.2d at 307]. This role for the courts was further clarified in *Misco, supra.* While acknowledging a court's right to refuse to enforce an award on public-policy grounds, the Court in *Misco* found that generalizations about safety were not enough to establish public policy. See, also, *Bd. of Cty. Commrs. v. Kimball & Assoc.*

(C.A.6, 1988), 860 F.2d 683, 686, certiorari denied, 494 U.S. 1030, 110 S.Ct. 1480, 108 L.Ed.2d 617.

"Ohio law has recognized the right of its courts to refuse to enforce an arbitrator's award in a slightly different fashion from that articulated in *W.R. Grace* and *Misco, supra.* The legislature, in R.C. 2711.10, codified reasons which allow a trial court to vacate an arbitration award. Pertinent to this case is [R.C.] 2711.10(D), which provides that a court may vacate an arbitration award if 'the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made.' Case law holds that an arbitrator exceeds his or her power when the arbitrator's award fails to draw its essence from the collective-bargaining agreement. It is crucial, therefore, in deciding this appeal, to ascertain the meaning of 'fails to draw its essence from the collective-bargaining agreement.'

"In *Mahoning Cty. Bd. v. Mahoning Cty. TMR Educ. Assoc.* (1986), 22 Ohio St.3d 80 [22 OBR 95], 488 N.E.2d 872, paragraph one of the syllabus, the court held that an arbitrator's award draws its essence from a collective-bargaining agreement 'when there is a rational nexus between the agreement and the award, and where the award is not arbitrary, capricious, or unlawful.'

"In *Ohio Off. of Coll. Barg. v. Civil Serv. Emp.* (1991), 59 Ohio St.3d 177, 572 N.E.2d 71, the court, in its syllabus, held that 'an arbitrator's award departs from the essence of a collective bargaining agreement when: (1) the award conflicts with the express terms of the agreement, and/or (2) the award is without rational support or cannot be rationally derived from the terms of the agreement.'

"In addition to these principles of labor arbitration is a generally accepted principle in Ohio that a contract which is against public policy will not be enforced. *Gugle v. Loeser* (1944), 143 Ohio St. 362 [28 O.O. 318], 55 N.E.2d 580."

■ We now apply these principles to the three appeals before us. Our review of the trial court's decisions in these appeals is *de novo. Cleveland Bd. of Edn. v. Internatl. Bhd. of Firemen & Oilers, Local 701.*[10] Critical to all three appeals is the determination of whether each arbitration award draws its essence from the agreement, as the Union urges, or whether each award exceeds the arbitrator's authority because it fails to draw its essence from the agreement and violates public policy, as SORTA urges. Before we begin our analysis of each appeal, we have two additional observations. We share SORTA's concern for the safety of the general public and its own employees, and acknowledge, as we did in *SORTA I,* that the duty of common carriers to ensure the safety of their passengers and the rest of the travelling public is a valid, compelling, and clearly established

---

**10.** (1997), 120 Ohio App.3d 63, 696 N.E.2d 658.

public policy. On the other hand, the fact that we are dealing with transportation workers does not provide an open invitation to courts to invalidate arbitration awards. Setting aside a labor arbitration award is still the exception, not the general rule.

In each arbitration now before us on appeal, the neutral arbitrator was disturbed by the company's mandated remedy of termination in contrast to the less severe remedies promulgated by the Department of Transportation. Whether the just-cause provision of the CBA gives the arbitrator the right to impose progressive discipline in the face of a unilaterally implemented policy that does not allow for progressive discipline is beyond the scope of this opinion.[11]

### BAKER APPEAL (C–970967)

■ The arbitrator found on due process grounds that Baker's termination was not for just cause. The arbitrator found that SORTA's notice of the change in its drug policy was inadequate because it failed to inform Baker that the definition of a positive test had been changed (lowered) and that a drug level that had previously resulted in no discipline at all now resulted in termination. In its sole assignment of error in the Baker appeal, the Union argues that the trial court erred in vacating the arbitration award and in failing to grant the Union's motion to confirm the award. While this assignment raises some troubling issues, we disagree with the Union.

In ruling in favor of SORTA on its motion to vacate Baker's arbitration award, the magistrate relied on *Stroehmann Bakeries, Inc. v. Local 776, Internatl. Bhd. of Teamsters*,[12] a sexual-harassment decision from the Federal Third Circuit Court of Appeals, holding that when an employee is discharged for an offense that violates public policy, an arbitration award reinstating the employee without a finding that the employee did not commit the offense as charged violates public policy and must be vacated. We are not prepared to go that far in this case. We find far simpler reasoning applicable here.

■ While the due process arguments made by the arbitrator are compelling in a general sense, in that we agree that an employee who is going to be fired for having a positive drug test is entitled to know (in English, rather than in regulationese, if possible) [13] what constitutes a positive test, especially when the

---

11. See F. Elkouri & E. Elkouri, How Arbitration Works (5 Ed.1997) 799–801 and 910–918.

12. (C.A.3, 1992), 969 F.2d 1436, certiorari denied, 506 U.S. 1022, 113 S.Ct. 660, 121 L.Ed.2d 585.

13. A positive drug test is defined in the SORTA policy Part II, subpart 6.0, as follows:

definition has changed, in this case, the arbitrator's conclusion is not supported by Baker's testimony.

Baker acknowledged receiving and being familiar with the policy, whose provisions included the following introduction to a general management policy in favor of a zero-tolerance, drug-free workplace:

"Part III.   Drug Free Workplace Notice

"The unlawful manufacture, distribution, dispensing, possession, or use of all controlled substances is prohibited in SORTA/the Metro's workplace.   Employees so found will be subject to immediate discharge."

Another section of the Policy provided this introduction:

"Part IV.   'Consequences'

"The penalty for any violation of the 'Substance Abuse Policy' or 'Drug–Free Workplace Act' is immediate termination of employment * * * [with two exceptions not pertinent to this case].   There are no second chances or last chance agreements under these circumstances."

While Baker might not have known the exact metabolite levels, she testified that she was informed about the policy and knew that any drugs in her system would result in termination, but she claimed she had only inhaled, not smoked, marijuana, a finding *the arbitrator expressly rejected.*   Simply put, the award in this case departs from the essence of the CBA because the award was without rational support and could not rationally have been derived from the terms of the agreement.   *Ohio Office of Collective Bargaining v. Ohio Civ. Serv. Emp. Assn., Local 11, AFSCME, AFL-CIO.*[14]   Therefore, the trial court did not err in adopting the magistrate's recommendation to vacate the arbitration award and in upholding Baker's termination.   The Union's assignment of error is overruled.

### CLEM APPEAL (C–971118)

In the Clem appeal, SORTA argues, in two assignments or error, that the trial court erred in confirming the arbitration award, and in failing to grant its own motion to vacate the arbitration award.   We disagree.

---

"A positive test means a prohibited substance appearing in the employee's urine specimen which surpasses the thresholds established by the Department of Health and Human Services (DHHS) as adopted by the Department of Transportation (DOT) in 49 CFR Part 40, as amended.   These thresholds are determined by medical experts to be evidence that an illegal substance is in employee's system.

"These thresholds are subject to change due to DOT requirements."

14.   (1991), 59 Ohio St.3d 177, 572 N.E.2d 71.

Clem was unable to provide a urine sample, which, under the circumstances outlined below, was deemed a refusal by SORTA, and Clem was fired. The SORTA policy was unilaterally promulgated and written by SORTA. Under the policy, refusal is detailed as follows:

"A refusal means that an employee fails to provide a drug or alcohol testing sample as required by this policy without a valid medical explanation from a doctor chosen by Metro, or engages in conduct that obstructs the testing process.

"Refusals include, but are not limited to the following: refusal to take the test, inability to provide sufficient quantities of breath or urine to be tested without a valid medical explanation, tampering with or attempting to adulterate the specimen or collection procedure, not reporting to the collection site in the time allotted, or leaving the scene of an accident without a valid reason before the tests have been conducted."

The arbitrator's opinion is this case is well written and well reasoned. The arbitrator found that there was a valid medical explanation for Clem's inability to provide a urine sample, that SORTA unfairly ignored the findings of Clem's doctors solely because the findings were more psychological than physiological,[15] and that SORTA had failed to prove that catheterization, which Clem had requested, was not a proper or allowable procedure. Upon review, the trial court accepted and properly deferred to the arbitrator's finding that Clem did not willfully refuse to provide a urine sample and that an adequate medical explanation existed for his inability to provide a sample. Thus, the award clearly drew its essence from the agreement, as defined in *Mahoning Cty. Bd., supra,* and the trial court correctly found that the reinstatement of Clem did not offend public policy. SORTA's assignments of error are overruled, and the decision confirming the arbitration award is affirmed.

## BINDER APPEAL (C–980044)

■ In the Binder appeal, the Union argues in its sole assignment of error that the trial court erred in vacating the arbitration award and in failing to grant the Union's motion to confirm the award. We agree and reverse the judgment of the trial court in this case.

The trial court accepted the arbitrator's finding that there was a conflict in the policy, applicable to Binder, between the termination provision (for any employee who tested positive for drugs on his biennial physical) and the removal-from-duty provision (for any employee who failed the biennial physical examination for a

---

15. The federal regulations have been changed, and now a medical explanation must be based upon a physiological reason. Psychological bases are unacceptable.

correctable or temporary problem). The court further concluded that this conflict was not easily reconcilable. Nevertheless, the court ultimately held that because the use of marijuana, *per se*, is unlawful, the reinstatement of an employee who uses marijuana violates public policy and jeopardizes the safety of the public and the employee. Therefore, the court concluded that the arbitrator's award was irrational and failed to draw its essence from the agreement because it violated the clear, long-standing public policy of Ohio.

■ As discussed above, a court's refusal to adopt an arbitrator's interpretation of a contract provision on public-policy grounds is justified only in situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant under laws and legal precedents, not under general considerations of supposed public interest. *Grace, supra.*[16]

While this court certainly agrees that the use of marijuana is statutorily prohibited in Ohio, it is the safety issue—the public policy against the impairment of transportation workers on the job—that has historically served as the basis to vacate an arbitration award in this setting. Unlike the safety-sensitive employees in the other two appeals, Binder, who was not a safety-sensitive employee, tested positive for marijuana on a day he was *not* working. In fact, he was tested on a Friday and was not due to return to work until the following Sunday. The test results were received on a Tuesday. SORTA produced no evidence indicating that Binder tested positive at work, and the arbitrator was not willing to find grounds for termination based upon a confirmatory drug test result of 36 ng/ml when Binder was off duty. Neither the trial court nor SORTA has cited any legal precedent justifying the use of the public-policy exception in a case with these facts.

Had Binder tested positive while on duty, our conclusion would likely be otherwise. However, under these facts, the nexus between Binder's positive test results and the safety of the public and Binder's fellow employees several days later is simply too attenuated for public policy to override the arbitrator's award. In this context, the arbitrator's determination that Binder had a temporary and correctable condition clearly drew its essence from the agreement. Thus, in this case, the arbitrator's decision must remain undisturbed. *Findlay, supra.*[17]

The Union's assignment of error is sustained. The decision of the trial court vacating the arbitration award in favor of Binder is reversed, and that award is hereby reinstated.

---

16. 461 U.S. at 766, 103 S.Ct.at 2183, 76 L.Ed.2d at 307.

17. 49 Ohio St.3d 129, 551 N.E.2d 186.

## SUMMARY

In appeal No. C–970967, we affirm the trial court's judgment vacating the arbitrator's award in favor of Sarah Baker and upholding her termination. In appeal No. C–971118, we affirm the trial court's judgment confirming the arbitrator's award in favor of Stewart Clem. In appeal No. C–980044, we reverse the trial court's judgment vacating the arbitrator's award in favor of Joseph Binder and order that award to be reinstated.

*Judgment accordingly.*

DOAN, P.J., and PAINTER, J., concur.